*728 Justice Alito
delivered the opinion of the Court.
In this appeal, we consider the constitutionality of federal election law provisions that, under certain circumstances, impose different campaign contribution limits on candidates competing for the same congressional seat.
I
A
Federal law limits the amount of money that a candidate for the House of Representatives and the candidate’s authorized committee may receive from an individual, as well as the amount that the candidate’s party may devote to coordinated campaign expenditures. 2 U. S. C. § 441a (2006 ed.). [1] Under the usual circumstances, the same restrictions apply to all the competitors for a seat and their authorized committees. Contributions from individual donors during a 2-year election cycle are subject to a cap, which is currently set at $2,300. See §§ 441a(a)(1)(A), (c); 72 Fed. Reg. 5295 (2007). In addition, no funds may be accepted from an individual whose aggregate contributions to candidates and their committees during the election cycle have reached the legal limit, currently $42,700. See 2 U. S. C. §§ 441a(a)(3)(A), (c); 72 Fed. Reg. 5295. A candidate also may not accept general election coordinated expenditures by national or state political party committees that exceed an imposed limit. See 2 U. S. C. §§ 441a(c), (d). Currently, the limit for candidates in States with more than one House seat is $40,900. 72 Fed. Reg. 5294.[2]
*729 Section 319(a) of the Bipartisan Campaign Reform Act of 2002 (BCRA), 116 Stat. 109, 2 U. S. C. § 441a-1(a),[3] part of the so-called “Millionaire’s Amendment,” fundamentally alters this scheme when, as a result of a candidate’s expenditure of personal funds, the “opposition personal funds amount” (OPFA) exceeds $350,000.[4] The OPFA, in simple terms, is a statistic that compares the expenditure of personal funds by competing candidates and also takes into account to some degree certain other fundraising.[5] See § 441a-1(a). When a candidate’s expenditure of personal funds causes the OPFA to pass the $350,000 mark (for convenience, such candidates will be referred to as “self-financing”), a new, asymmetrical regulatory scheme comes into play. The self-financing candidate remains subject to the limitations noted above, but the candidate’s opponent (the “non-self-financing” candidate) may receive individual contributions at treble the normal limit (e.g., $6,900 rather than the current $2,300), even from individuals who have reached the normal aggregate contributions cap, and may accept coordinated party expenditures without limit. See §§ 441a-1(a)(1)(AMC). Once the non-self-financing candidate’s receipts exceed the OPFA, the prior limits are revived. § 441a-1(a)(3). A candidate who does not spend the *730 contributions received under the asymmetrical limits must return them. § 441a-1(a)(4).
In order to calculate the OPFA, certain information is needed about the self-financing candidate’s campaign assets and personal expenditures. Section 319(b) thus requires self-financing candidates to make three types of disclosures. First, within 15 days after entering a race, a candidate must file a “[declaration of intent” revealing the amount of personal funds the candidate intends to spend in excess of $350,000. 2 U. S. C. §441a-1(b)(1)(B). A candidate who does not intend to cross this threshold may simply declare an intent to spend no personal funds. 11 CFR § 400.20(a)(2) (2008). Second, within 24 hours of crossing or becoming obligated to cross the $350,000 mark, the candidate must file an “[i]nitial notification.” 2 U. S. C. § 441a-1(b)(1)(C). Third, the candidate must file an “[additional notification” within 24 hours of making or becoming obligated to make each additional expenditure of $10,000 or more using personal funds. § 441a-1(b)(1)(D). The initial and additional notifications must provide the date and amount of each expenditure from personal funds, and all notifications must be filed with the Federal Election Commission (FEC), all other candidates for the seat, and the national parties of all those candidates. § 441a-1(b)(1)(E). Failure to comply with the reporting requirements may result in civil and criminal penalties. §§ 437g(a)(5)-(6), (d)(1).
A non-self-financing candidate and the candidate’s committee face less extensive disclosure requirements. Within 24 hours after receiving an “initial” or “additional” notification filed by a self-financing opponent, a non-self-financing candidate must provide notice to the FEC and the national and state committees of the candidate’s party if the non-self-financing candidate concludes based on the newly acquired information that the OPFA has passed the $350,000 mark. 11 CFR § 400.30(b)(2). In addition, when the additional contributions that a non-self-financing candidate is authorized *731 to receive pursuant to the asymmetrical limitations scheme equals the OPFA, the non-self-financing candidate must notify the FEC and the appropriate national and state committees within 24 hours. § 400.31(e)(1)(ii). The non-self-financing candidate must also provide notice regarding any refunds of “excess funds” (funds received under the increased limits but not used in the campaign). §§ 400.50, 400.54. For their part, political parties must notify the FEC and the candidate they support within 24 hours of making any expenditures that exceed the normal limit for coordinated party expenditures. § 400.30(c)(2).
B
Appellant Jack Davis was the Democratic candidate for the House of Representatives from New York’s 26th Congressional District in 2004 and 2006. In both elections, he lost to the incumbent. In his brief, Davis discloses having spent $1.2 million, principally his own funds, on his 2004 campaign. Brief for Appellant 4. He reports spending $2.3 million in 2006, all but $126,000 of which came from personal funds. Id., at 13. His opponent in 2006 spent no personal funds. Indeed, although the OPFA calculation provided the opportunity for Davis’ opponent to raise nearly $1.5 million under § 319(a)’s asymmetrical limits, Davis’ opponent adhered to the normal contribution limits.
Davis’ 2006 candidacy began in March 2006, when he filed with the FEC a “Statement of Candidacy” and, in compliance with § 319(b), declared that he intended to spend $1 million in personal funds during the general election. Two months later, in anticipation of this expenditure and its § 319 consequences, Davis filed suit against the FEC, requesting that § 319 be declared unconstitutional and that the FEC be enjoined from enforcing it during the 2006 election.
After Davis declared his candidacy but before he filed suit, the FEC’s general counsel notified him that it had reason to believe that he had violated §319 by failing to report per *732 sonal expenditures during the 2004 campaign. The FEC proposed a conciliation agreement under which Davis would pay a substantial civil penalty. Davis responded by agreeing to toll the limitations period for an FEC enforcement action until resolution of this suit.
Davis filed this action in the United States District Court for the District of Columbia, and a three-judge panel was convened. BCRA § 403, 116 Stat. 113, note following 2 U. S. C. § 437h. While Davis requested that the case be decided before the general election campaign began on September 12, 2006, the FEC opposed the request, asserting the need for extensive discovery, and the request was denied. Ultimately, the parties filed cross-motions for summary judgment.
Ruling on those motions, the District Court began by addressing Davis’ standing sua sponte. The court concluded that Davis had standing, but rejected his claims on the merits and granted summary judgment for the FEC. 501 F. Supp. 2d 22 (2007). Davis then invoked BCRA’s exclusive avenue for appellate review—direct appeal to this Court. Note following § 437h. We deferred full consideration of our jurisdiction, 552 U. S. 1135 (2008), and we now reverse.
II
Like the District Court, we must first ensure that we have jurisdiction to hear Davis’ appeal. Article III restricts federal courts to the resolution of cases and controversies. Arizonans for Official English v. Arizona, 520 U. S. 43, 64 (1997). That restriction requires that the party invoking federal jurisdiction have standing — the “personal interest that must exist at the commencement of the litigation.” Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U. S. 167, 189 (2000) (internal quotation marks omitted). But it is not enough that the requisite interest exist at the outset. “To qualify as a case fit for *733 federal-court adjudication, ‘an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.’ ” Arizonans for Official English, supra, at 67. The FEC argues that Davis’ appeal fails to present a constitutional case or controversy because Davis lacks standing and because his claims are moot. We address each of these issues in turn.
A
As noted, the requirement that a claimant have “standing is an essential and unchanging part of the case-or-controversy requirement of Article III.” Lujan v. Defenders of Wildlife, 504 U. S. 555, 560 (1992); see also Arizonans for Official English, supra, at 64. To qualify for standing, a claimant must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant’s challenged behavior; and likely to be redressed by a favorable ruling. Lujan, supra, at 560-561.
The District Court held, and the parties do not dispute, that Davis possesses standing to challenge the disclosure requirements of § 319(b). When Davis filed suit, he had already declared his 2006 candidacy and had been forced by § 319(b) to disclose to his opponent that he intended to spend more than $350,000 in personal funds. At that time, Davis faced the imminent threat that he would have to follow up on that disclosure with further notifications after he in fact passed the $350,000 mark. Securing a declaration that § 319(b)’s requirements are unconstitutional and an injunction against their enforcement would have spared him from making those disclosures. That relief also would have removed the real threat that the FEC would pursue an enforcement action based on alleged violations of § 319(b) during his 2004 campaign. As a result, Davis possesses standing to challenge § 319(b)’s disclosure requirement.
The fact that Davis has standing to challenge § 319(b) does not necessarily mean that he also has standing to challenge *734 the scheme of contribution limitations that applies when § 319(a) comes into play. “[Standing is not dispensed in gross.” Lewis v. Casey, 518 U. S. 343, 358, n. 6 (1996). Rather, “a plaintiff must demonstrate standing for each claim he seeks to press” and “'for each form of relief’” that is sought. Daimler Chrysler Corp. v. Cuno, 547 U. S. 332, 352 (2006) (quoting Friends of Earth, supra, at 185).
In light of these principles, the FEC argues that Davis lacks standing to attack § 319(a)’s asymmetrical limits. When Davis commenced this action, his opponent had not yet qualified for the asymmetrical limits, and later, when his opponent did qualify to take advantage of those limits, he chose not to do so. Accordingly, the FEC argues that § 319(a) did not cause Davis any injury.
While the proof required to establish standing increases as the suit proceeds, see Lujan, supra, at 561, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed. Friends of Earth, supra, at 180; Arizonans for Official English, supra, at 68, n. 22. As noted above, the injury required for standing need not be actualized. A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct. Los Angeles v. Lyons, 461 U. S. 95, 102 (1983); see also Babbitt v. Farm Workers, 442 U. S. 289, 298 (1979) (A plaintiff may challenge the prospective operation of a statute that presents a realistic and impending threat of direct injury). Davis faced such an injury from the operation of § 319(a) when he filed suit. Davis had declared his candidacy and his intent to spend more than $350,000 of personal funds in the general election campaign whose onset was rapidly approaching. Section 319(a) would shortly burden his expenditure of personal funds by allowing his opponent to receive contributions on more favorable terms, and there was no indication that his opponent would forgo that opportunity. In *735 deed, the record at summary judgment indicated that most candidates who had the opportunity to receive expanded contributions had done so. App. 89. In these circumstances, we conclude that Davis faced the requisite injury from § 319(a) when he filed suit and has standing to challenge that provision’s asymmetrical contribution scheme.
B
The FEC’s mootness argument also fails. This case closely resembles Federal Election Comm’n v. Wisconsin Right to Life, Inc., 551 U. S. 449 (2007). There, Wisconsin Right to Life (WRTL), a nonprofit, ideological advocacy corporation, wished to run radio and TV ads within 30 days of the 2004 Wisconsin primary, contrary to a restriction imposed by BCRA. WRTL sued the FEC, seeking declaratory and injunctive relief. Although the suit was not resolved before the 2004 election, we rejected the FEC’s claim of mootness, finding that the case “fit comfortably within the established exception to mootness for disputes capable of repetition, yet evading review.” Id., at 462. That “exception applies where ‘(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.’” Ibid, (quoting Spencer v. Kemna, 523 U. S. 1, 17 (1998)).
In WRTL, “despite BCRA’s command that the cas[e] be expedited ‘to the greatest possible extent,’ ” WRTL’s claims could not reasonably be resolved before the election concluded. 551 U. S., at 462 (quoting § 403(a)(4), 116 Stat. 114, note following 2 U. S. C. § 437h). Similarly, in this case despite BCRA’s mandate to expedite and Davis’ request that his case be resolved before the 2004 general election season commenced, Davis’ case could not be resolved before the 2006 election concluded, demonstrating that his claims are capable of evading review.
*736 As to the second prong of the exception, even though WRTL raised an as-applied challenge, we found its suit capable of repetition where “WRTL credibly claimed that it planned on running ‘materially similar’ future” ads subject to BCRA’s prohibition and had, in fact, sought an injunction that would permit such an ad during the 2006 election. 551 U. S., at 463 (some internal quotation marks omitted). Here, the FEC conceded in its brief that Davis’ § 319(a) claim would be capable of repetition if Davis planned to self-finance another bid for a House seat. Brief for Appellee 14, 20-21, and n. 5. Davis subsequently made a public statement expressing his intent to do so. See Reply Brief 16 (citing Terreri, Democrat Davis Confirms He’ll Run Again for Congress, Rochester Democrat and Chronicle, Mar. 27, 2008, p. 5B). As a result, we are satisfied that Davis’ facial challenge is not moot.[6]
Ill
We turn to the merits of Davis’ claim that the First Amendment is violated by the contribution limits that apply when § 319(a) comes into play. Under this scheme, as previously noted, when a candidate spends more than $350,000 in personal funds and creates what the statute apparently regards as a financial imbalance, that candidate’s opponent may qualify to receive both larger individual contributions than would otherwise be allowed and unlimited coordinated party expenditures. Davis contends that § 319(a) unconstitutionally burdens his exercise of his First Amendment right to make unlimited expenditures of his personal funds because making expenditures that create the imbalance has the effect of enabling his opponent to raise more money and to use that money to finance speech that counteracts and thus diminishes the effectiveness of Davis’ own speech.
*737 A
If § 319(a) simply raised the contribution limits for all candidates, Davis’ argument would plainly fail. This Court has previously sustained the facial constitutionality of limits on discrete and aggregate individual contributions and on coordinated party expenditures. Buckley v. Valeo, 424 U. S. 1, 23-35, 38, 46-47, and n. 53 (1976) (per curiam); Federal Election Comm’n v. Colorado Republican Federal Campaign Comm., 533 U. S. 431, 437, 465 (2001) (Colorado II). At the same time, the Court has recognized that such limits implicate First Amendment interests and that they cannot stand unless they are “closely drawn” to serve a “sufficiently important interest,” such as preventing corruption and the appearance of corruption. See, e. g., McConnell v. Federal Election Comm’n, 540 U. S. 93, 136, 138, n. 40 (2003); Colorado II, supra, at 456; Nixon v. Shrink Missouri Government PAC, 528 U. S. 377, 387-388 (2000); Buckley, supra, at 25-30, 38. When contribution limits are challenged as too restrictive, we have extended a measure of deference to the judgment of the legislative body that enacted the law. See, e. g., Randall v. Sorrell, 548 U. S. 230, 248 (2006) (plurality opinion); Nixon, supra, at 396-397; Buckley, supra, at 30, 111, 103-104. But we have held that limits that are too low cannot stand. Randall, 548 U. S., at 246-262; id., at 263 (Alito, J., concurring in part and concurring in judgment).
There is, however, no constitutional basis for attacking contribution limits on the ground that they are too high. Congress has no constitutional obligation to limit contributions at all; and if Congress concludes that allowing contributions of a certain amount does not create an undue risk of corruption or the appearance of corruption, a candidate who wishes to restrict an opponent’s fundraising cannot argue that the Constitution demands that contributions be regulated more strictly. Consequently, if § 319(a)’s elevated contribution limits applied across the board, Davis would not have any basis for challenging those limits.
*738 B
Section 319(a), however, does not raise the contribution limits across the board. Rather, it raises the limits only for the non-self-financing candidate and does so only when the self-financing candidate’s expenditure of personal funds causes the OPFA threshold to be exceeded. We have never upheld the constitutionality of a law that imposes different contribution limits for candidates who are competing against each other, and we agree with Davis that this scheme impermissibly burdens his First Amendment right to spend his own money for campaign speech.
In Buckley, we soundly rejected a cap on a candidate’s expenditure of personal funds to finance campaign speech. We held that a “candidate . . . has a First Amendment right to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election” and that a cap on personal expenditures imposes “a substantial,” “cleajr],” and “direcft]” restraint on that right. 424 U. S., at 52-53. We found that the cap at issue was not justified by “[t]he primary governmental interest” proffered in its defense, i. e., “the prevention of actual and apparent corruption of the political process.” Id., at 53. Far from preventing these evils, “the use of personal funds,” we observed, “reduces the candidate’s dependence on outside contributions and thereby counteracts the coercive pressures and attendant risks of abuse to which . . . contribution limitations are directed.” Ibid. We also rejected the argument that the expenditure cap could be justified on the ground that it served “[t]he ancillary interest in equalizing the relative financial resources of candidates competing for elective office.” Id., at 54. This putative interest, we noted, was “clearly not sufficient to justify the . . . infringement of fundamental First Amendment rights.” Ibid.
Buckley’s emphasis on the fundamental nature of the right to spend personal funds for campaign speech is instructive. While BCRA does not impose a cap on a candidate’s expendí *739 ture of personal funds, it imposes an unprecedented penalty-on any candidate who robustly exercises that First Amendment right. Section 319(a) requires a candidate to choose between the First Amendment right to engage in unfettered political speech and subjection to discriminatory fundraising limitations. Many candidates who can afford to make large personal expenditures to support their campaigns may choose to do so despite § 319(a), but they must shoulder a special and potentially significant burden if they make that choice. See Day v. Holahan, 34 F. 3d 1356, 1359-1360 (CA8 1994) (concluding that a Minnesota law that increased a candidate’s expenditure limits and eligibility for public funds based on independent expenditures against her candidacy burdened the speech of those making the independent expenditures); Brief for Appellee 29 (conceding that “[§]319 does impose some consequences on a candidate’s choice to self-finance beyond certain amounts”). Under § 319(a), the vigorous exercise of the right to use personal funds to finance campaign speech produces fundraising advantages for opponents in the competitive context of electoral politics. Cf. Pacific Gas & Elec. Co. v. Public Util. Comm’n of Cal., 475 U. S. 1,14 (1986) (plurality opinion) (finding infringement on speech rights where if the plaintiff spoke it could “be forced ... to help disseminate hostile views”).
The resulting drag on First Amendment rights is not constitutional simply because it attaches as a consequence of a statutorily imposed choice. In Buckley, we held that Congress “may engage in public financing of election campaigns and may condition acceptance of public funds on an agreement by the candidate to abide by specified expenditure limitations” even though we found an independent limit on overall campaign expenditures to be unconstitutional. 424 U. S., at 57, n. 65; see id., at 54-58. But the choice involved in Buckley was quite different from the choice imposed by § 319(a). In Buckley, a candidate, by forgoing public financing, could retain the unfettered right to make unlimited per *740 sonal expenditures. Here, § 319(a) does not provide any way in which a candidate can exercise that right without abridgment. Instead, a candidate who wishes to exercise that right has two choices: abide by a limit on personal expenditures or endure the burden that is placed on that right by the activation of a scheme of discriminatory contribution limits. The choice imposed by § 319(a) is not remotely parallel to that in Buckley.
Because § 319(a) imposes a substantial burden on the exercise of the First Amendment right to use personal funds for campaign speech, that provision cannot stand unless it is “justified by a compelling state interest,” Federal Election Comm’n v. Massachusetts Citizens for Life, Inc., 479 U. S. 238, 256 (1986); see also, e. g., McConnell, 540 U. S., at 205; Austin v. Michigan Chamber of Commerce, 494 U. S. 652, 657-658 (1990); id., at 680 (Scalia, J., dissenting); id., at 701, 702-703 (Kennedy, J., dissenting); Federal Election Comm’n v. National Conservative Political Action Comm., 470 U. S. 480, 500-501 (1985); First Nat. Bank of Boston v. Bellotti, 435 U. S. 765, 786 (1978); Colorado Republican Federal Campaign Comm. v. Federal Election Comm’n, 518 U. S. 604, 609 (1996) (Colorado I) (principal opinion); id., at 640-641 (Thomas, J., concurring in judgment and dissenting in part). No such justification is present here.[7]
The burden imposed by § 319(a) on the expenditure of personal funds is not justified by any governmental interest in eliminating corruption or the perception of corruption. The Buckley Court reasoned that reliance on personal funds re *741 duces the threat of corruption, and therefore § 319(a), by discouraging use of personal funds, disserves the anticorruption interest. Similarly, given Congress’ judgment that liberalized limits for non-self-financing candidates do not unduly imperil anticorruption interests, it is hard to imagine how the denial of liberalized limits to self-financing candidates can be regarded as serving anticorruption goals sufficiently to justify the resulting constitutional burden.
The Government maintains that §319(a)’s asymmetrical limits are justified because they “level electoral opportunities for candidates of different personal wealth.” Brief for Appellee 34. “Congress enacted Section 319,” the Government writes, “to reduce the natural advantage that wealthy individuals possess in campaigns for federal office.” Id., at 33 (emphasis added). Our prior decisions, however, provide no support for the proposition that this is a legitimate government objective. See Nixon, 528 U. S., at 428 (Thomas, J., dissenting) (“ ‘[Preventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances’” (quoting National Conservative Political Action Comm., supra, at 496-497)); Randall, 548 U. S., at 268 (Thomas, J., concurring in judgment) (noting “the interests the Court has recognized as compelling, i. e., the prevention of corruption or the appearance thereof”). On the contrary, in Buckley, we held that “[t]he interest in equalizing the financial resources of candidates” did not provide a “justification for restricting” candidates’ overall campaign expenditures, particularly where equalization “might serve ... to handicap a candidate who lacked substantial name recognition or exposure of his views before the start of the campaign.” 424 U. S., at 56-57. We have similarly held that the interest “in equalizing the relative ability of individuals and groups to influence the outcome of elections” cannot support a cap on expenditures for “express advocacy of the election or defeat of candidates,” as “the concept that govern- *742 merit may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment.” Id., at 48-49; see also McConnell, supra, at 227 (noting, in assessing standing, that there is no legal right to have the same resources to influence the electoral process). Cf. Austin, supra, at 705 (Kennedy, J., dissenting) (rejecting as “antithetical to the First Amendment” “the notion that the government has a legitimate interest in restricting the quantity of speech to equalize the relative influence of speakers on elections”).
The argument that a candidate’s speech may be restricted in order to “level electoral opportunities” has ominous implications because it would permit Congress to arrogate the voters’ authority to evaluate the strengths of candidates competing for office. See Bellotti, supra, at 791-792 (“[T]he people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments” and “may consider, in making their judgment, the source and credibility of the advocate”). Different candidates have different strengths. Some are wealthy; others have wealthy supporters who are willing to make large contributions. Some are celebrities; some have the benefit of a well-known family name. Leveling electoral opportunities means making and implementing judgments about which strengths should be permitted to contribute to the outcome of an election. The Constitution, however, confers upon voters, not Congress, the power to choose the Members of the House of Representatives, Art. I, § 2, and it is a dangerous business for Congress to use the election laws to influence the voters’ choices. See Bellotti, supra, at 791, n. 31 (The “[g]overnment is forbidden to assume the task of ultimate judgment, lest the people lose their ability to govern themselves”).
Finally, the Government contends that § 319(a) is justified because it ameliorates the deleterious effects that result from the tight limits that federal election law places on indi *743 vidual campaign contributions and coordinated party expenditures. These limits, it is argued, make it harder for candidates who are not wealthy to raise funds and therefore provide a substantial advantage for wealthy candidates. Accordingly, § 319(a) can be seen, not as a legislative effort to interfere with the natural operation of the electoral process, but as a legislative effort to mitigate the untoward consequences of Congress’ own handiwork and restore “the ‘normal relationship’ between a candidate’s financial resources and the level of popular support for his candidacy.” Brief for Appellee 33.
Whatever the merits of this argument as an original matter, it is fundamentally at war with the analysis of expenditure and contributions limits that this Court adopted in Buckley and has applied in subsequent cases. The advantage that wealthy candidates now enjoy and that § 319(a) seeks to reduce is an advantage that flows directly from Buckley’s disparate treatment of expenditures and contributions. If that approach is sound—and the Government does not urge us to hold otherwise[8]—it is hard to see how undoing the consequences of that decision can be viewed as a compelling interest. If the normally applicable limits on individual contributions and coordinated party contributions are seriously distorting the electoral process, if they are feeding a “public perception that wealthy people can buy seats in Congress,” Brief for Appellee 34, and if those limits are not needed in order to combat corruption, then the obvious remedy is to raise or eliminate those limits. But the unprece *744 dented step of imposing different contribution and coordinated party expenditure limits on candidates vying for the same seat is antithetical to the First Amendment.
IV
The remaining issue that we must consider is the constitutionality of §319(b)’s disclosure requirements. “[W]e have repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment.” Buckley, 424 U. S., at 64. As a result, we have closely scrutinized disclosure requirements, including requirements governing independent expenditures made to further individuals’ political speech. Id., at 75. To survive this scrutiny, significant encroachments “cannot be justified by a mere showing of some legitimate governmental interest.” Id., at 64. Instead, there must be “a ‘relevant correlation’ or 'substantial relation’ between the governmental interest and the information required to be disclosed,” and the governmental interest “must survive exacting scrutiny.” Ibid, (footnotes omitted). That is, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights. Id., at 68, 71.
The § 319(b) disclosure requirements were designed to implement the asymmetrical contribution limits provided for in § 319(a), and as discussed above, § 319(a) violates the First Amendment. In light of that holding, the burden imposed by the § 319(b) requirements cannot be justified, and it follows that they too are unconstitutional.[9]
* * *
In sum, we hold that §§ 319(a) and (b) violate the First Amendment. The judgment of the District Court is re *745 versed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

APPENDIX
BCRA §§ 319(a) and (b) provide:
“(a) Availability of increased limit
“(1) In general
“Subject to paragraph (3), if the opposition personal funds amount with respect to a candidate for election to the office of Representative in, or Delegate or Resident Commissioner to, the Congress exceeds $350,000—
“(A) the limit under subsection (a)(1)(A) with respect to the candidate shall be tripled;
“(B) the limit under subsection (a)(3) shall not apply with respect to any contribution made with respect to the candidate if the contribution is made under the increased limit allowed under subparagraph (A) during a period in which the candidate may accept such a contribution; and
“(C) the limits under subsection (d) with respect to any expenditure by a State or national committee of a political party on behalf of the candidate shall not apply.
“(2) Determination of opposition personal funds amount
“(A) In general
“The opposition personal funds amount is an amount equal to the excess (if any) of—
“(i) the greatest aggregate amount of expenditures from personal funds (as defined in subsection (b)(1) of this section) that an opposing candidate in the same election makes; over
“(ii) the aggregate amount of expenditures from personal funds made by the candidate with respect to the election.
“(B) Special rule for candidate’s campaign funds
“(i) In general
“For purposes of determining the aggregate amount of expenditures from personal funds under subparagraph (A), *746 such amount shall include the gross receipts advantage of the candidate’s authorized committee.
“(ii) Gross receipts advantage
“For purposes of clause (i), the term 'gross receipts advantage’ means the excess, if any, of—
“(I) the aggregate amount of 50 percent of gross receipts of a candidate’s authorized committee during any election cycle (not including contributions from personal funds of the candidate) that may be expended in connection with the election, as determined on June 30 and December 31 of the year preceding the year in which a general election is held, over
“(II) the aggregate amount of 50 percent of gross receipts of the opposing candidate’s authorized committee during any election cycle (not including contributions from personal funds of the candidate) that may be expended in connection with the election, as determined on June 30 and December 31 of the year preceding the year in which a general election is held.
“(3) Time to accept contributions under increased limit
“(A) In general
“Subject to subparagraph (B), a candidate and the candidate’s authorized committee shall not accept any contribution, and a party committee shall not make any expenditure, under the increased limit under paragraph (1)—
"(i) until the candidate has received notification of the opposition personal funds amount under subsection (b)(1) of this section; and
“(ii) to the extent that such contribution, when added to the aggregate amount of contributions previously accepted and party expenditures previously made under the increased limits under this subsection for the election cycle, exceeds 100 percent of the opposition personal funds amount.
“(B) Effect of withdrawal of an opposing candidate
“A candidate and a candidate’s authorized committee shall not accept any contribution and a party shall not make any *747 expenditure under the increased limit after the date on which an opposing candidate ceases to be a candidate to the extent that the amount of such increased limit is attributable to such an opposing candidate.
“(4) Disposal of excess contributions
“(A) In general
“The aggregate amount of contributions accepted by a candidate or a candidate’s authorized committee under the increased limit under paragraph (1) and not otherwise expended in connection with the election with respect to which such contributions relate shall, not later than 50 days after the date of such election, be used in the manner described in subparagraph (B).
“(B) Return to contributors
“A candidate or a candidate’s authorized committee shall return the excess contribution to the person who made the contribution.
“(b) Notification of expenditures from personal funds
“(1) In general
“(A) Definition of expenditure from personal funds
“In this paragraph, the term ‘expenditure from personal funds’ means—
“(i) an expenditure made by a candidate using personal funds; and
“(ii) a contribution or loan made by a candidate using personal funds or a loan secured using such funds to the candidate’s authorized committee.
“(B) Declaration of intent
“Not later than the date that is 15 days after the date on which an individual becomes a candidate for the office of Representative in, or Delegate or Resident Commissioner to, the Congress, the candidate shall file a declaration stating the total amount of expenditures from personal funds that the candidate intends to make, or to obligate to make, with respect to the election that will exceed $350,000.
*748 “(C) Initial notification
“Not later than 24 hours after a candidate described in subparagraph (B) makes or obligates to make an aggregate amount of expenditures from personal funds in excess of $350,000 in connection with any election, the candidate shall file a notification.
“(D) Additional notification
“After a candidate files an initial notification under subparagraph (C), the candidate shall file an additional notification each time expenditures from personal funds are made or obligated to be made in an aggregate amount that exceeds $10,000. Such notification shall be filed not later than 24 hours after the expenditure is made.
“(E) Contents
“A notification under subparagraph (C) or (D) shall include—
“(i) the name of the candidate and the office sought by the candidate;
“(ii) the date and amount of each expenditure; and
“(iii) the total amount of expenditures from personal funds that the candidate has made, or obligated to make, with respect to an election as of the date of the expenditure that is the subject of the notification.
“(F) Place of filing
“Each declaration or notification required to be filed by a candidate under subparagraph (C), (D), or (E) shall be filed with—
“(i) the Commission; and
“(ii) each candidate in the same election and the national party of each such candidate.
“(2) Notification of disposal of excess contributions
“In the next regularly scheduled report after the date of the election for which a candidate seeks nomination for election to, or election to, Federal office, the candidate or the candidate’s authorized committee shall submit to the Com *749 mission a report indicating the source and amount of any excess contributions (as determined under subsection (a) of this section) and the manner in which the candidate or the candidate’s authorized committee used such funds.
“(3) Enforcement
“For provisions providing for the enforcement of the reporting requirements under this subsection, see section 437g of this title.” 2 U. S. C. § 441a-1 (footnotes omitted).

 All undesignated references in this opinion to 2 U. S. C. are to the 2006 edition.

 These limits are adjusted for inflation every two years. 2 U. S. C. § 441a(c).

 BCRA §§ 319(a) and (b) are set out in an appendix to this opinion. Although what we refer to as §§ 319(a) and (b) are actually § 315A(a) and (b) of the Federal Election Campaign Act of 1971, which were added to that Act by BCRA § 319(a), we follow the convention of the parties in making reference to §§ 319(a) and (b).

 BCRA § 304 similarly regulates self-financed Senate bids. 116 Stat. 97, 2 U. S. C. § 441a(i).

 The OPFA is calculated as follows. For each candidate, expenditures of personal funds are added to 50% of the funds raised for the election at issue measured at designated dates in the year preceding the election. The resulting figures are compared, and if the difference is greater than $350,000, the asymmetrical limits take effect. See §§ 441a-1(a)(1), (2).

 In light of this conclusion, we need not decide whether the threat of an FEC enforcement action for alleged 2004 violations would be sufficient to keep this controversy alive.

 Even if § 319(a) were characterized as a limit on contributions rather than expenditures, it is doubtful whether it would survive. A contribution limit involving “ ‘ “significant interference” ’ ” with associational rights must be “ ‘ “closely drawn” ’ ” to serve a “ ‘ “sufficiently important interest.”’” McConnell v. Federal Election Comm’n, 540 U. S. 93, 136 (2003). For the reasons explained infra, at 742, the chief interest proffered in support of the asymmetrical contribution scheme — leveling electoral opportunities — cannot justify the infringement of First Amendment interests.

 Justice Stevens would revisit and reject Buckley’s treatment of expenditure limits. Post, at 750-752 (opinion concurring in part and dissenting in part). The Government has not urged us to take that step, and in any event, Justice Stevens’ proposal is unsound. He suggests that restricting the quantity of campaign speech would improve the quality of that speech, but it would be dangerous for the Government to regulate core political speech for the asserted purpose of improving that speech. And in any event, there is no reason to suppose that restricting the quantity of campaign speech would have the desired effect.

 Because we conclude that §§ 319(a) and (b) violate the First Amendment, we need not address Davis’ claim that they also violate the equal protection component of the Fifth Amendment’s Due Process Clause.