**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

FILED
**United States Court of Appeals**
**Tenth Circuit**

**January 23, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

JOELLE RIDDLE; GARY HAUSLER;
KATHLEEN CURRY; THE
COMMITTEE TO ELECT KATHLEEN
CURRY; THE LIBERTARIAN PARTY
OF COLORADO,

     Plaintiffs-Appellants,

v.

JOHN HICKENLOOPER, in his official
capacity as Governor of the State of
Colorado; SCOTT GESSLER, in his
official capacity as Secretary of State of
the State of Colorado,

     Defendants-Appellees.

No. 13-1108

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 1:10-CV-01857-PAB-KMT)**

William E. Zimsky, Abadie & Schill, P.C., Durango, Colorado, for Plaintiff -Appellants.

Matthew D. Grove, Assistant Attorney General, State of Colorado, Denver, Colorado, for
Defendants-Appellees.

Before **GORSUCH**, **BALDOCK**, and **BACHARACH**, Circuit Judges.

**BACHARACH**, Circuit Judge.

In 2010, three individuals ran for the Colorado House of Representatives, House District 61: Kathleen Curry, Roger Wilson, and Luke Korkowski. Ms. Curry was a write-in candidate, Mr. Wilson was the Democratic nominee, and Mr. Korkowski was the Republican nominee. Under Colorado law, individual contributions to Ms. Curry were capped at $200, and individual contributions to each of her opponents were capped at $400. Unhappy with this disparity, contributors to Ms. Curry's campaign (along with others) sued state officials under 42 U.S.C. § 1983, claiming violation of the First Amendment and the Fourteenth Amendment's Equal Protection Clause. The district court rejected the claims and granted summary judgment to the state officials. Appellant's App., vol. I, at 146-78. We reverse on the equal-protection claim; and, in light of this decision, we decline to address the summary-judgment ruling on the First Amendment claims.

I.      **Colorado Law and the Disparity in Contribution Limits Among Candidates for the Same Office**

The disparity in contribution limits is affected by the State's procedure for determining which candidates can appear on the general-election ballot. For that determination, the State of Colorado distinguishes between the major parties (Republican and Democrat) and all other parties. Republican and Democratic candidates can obtain a place on the general-election ballot only by running in (and winning) a primary even when there is only one candidate seeking the nomination. *See* Colo. Rev. Stat. § 1-4-101(1) (2010) (stating the general rule that "only a major political party . . . shall be entitled to nominate candidates in a primary election"). But write-ins, unaffiliated

2

candidates, and minor-party nominees run in a primary only when multiple candidates vie for the nomination. *See* Colo. Rev. Stat. § 1-4-1304(1.5)(c) (2010) (stating that a primary will be used to nominate a candidate in a minor party if more than one candidate is designated by assembly or a combination of assembly and petition); Colo. Rev. Stat. § 1-4-802(1) (2010) (stating that unaffiliated candidates can qualify for a general election "other than [through] a primary election or a convention"); Colo. Rev. Stat. § 1-4-1101(1) (2010) (allowing candidates to obtain votes at a general election through write-in).

Against this backdrop, Colorado amended its state constitution. The amendment, known as "Amendment 27," set limits for the amount that could be given by a single contributor to candidates for state offices in the primaries and general elections. For candidates running for the state legislature, the limit was $200 for the primary and $200 for the general election.

In 2004, the legislature adopted the statute (Colo. Rev. Stat. §§ 1-45-103.7(3)-(4)) being challenged here. The statute effectively removed any potential time limitations on when a candidate committee could accept contributions when a primary is involved. For money ostensibly given for the primary, the candidate committee could accept the contribution and spend it during the general election; and, for money ostensibly given for the general election, the committee could accept the contribution and spend it even before the primary. *See* Colo. Rev. Stat. § 1-45-103.7(4) (2010).

The Secretary of State interprets Amendment 27 and the state statute to: (1) allow candidates with primaries to receive up to $400 from a single contributor and spend it

3

before or after the primary, and (2) disallow this flexibility for candidates without primaries.[1]

## II.   The Lawsuit, the Appeal, and Our Decision

The disparity in limits led to the filing of the present suit, with the Plaintiffs claiming an equal-protection violation for contributors to write-ins, unaffiliated candidates, and nominees for the minor parties.[2]  The federal district court held, as a matter of law, that the state statute did not violate the contributors' constitutional rights and granted summary judgment to the state officials.

The Plaintiffs appealed, arguing that the state statute violates the rights to equal protection, political expression, and association for individuals contributing to write-ins, unaffiliated candidates, and nominees for the minor parties.  We hold that the state statute, as applied, violates the contributors' rights to equal protection.[3]  Thus, we reverse and remand with instructions to grant summary judgment to the Plaintiffs on their equal-protection claim as applied here, when each candidate runs unopposed for the nomination.

---

[1]    The Plaintiffs do not question the correctness of the Secretary's interpretation; instead, they challenge the constitutionality of the state statute when interpreted in this manner.

[2]    The Plaintiffs are challenging the disparity rather than the amount of the contribution limit.  *See Randall v. Sorrell*, 548 U.S. 230, 262-63 (2006).

[3]    We need not decide whether the state statute is facially unconstitutional because the consequences of the decision would be the same.  *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 376 (2010) (Roberts, C.J., concurring).

## III.  The Statutory Classification and the Denial of Equal Protection

The equal-protection claim requires us to decide whether the state statute improperly discriminates among contributors when the major- and minor-party candidates are unopposed for their nominations.  This inquiry involves three questions:

1.   Are contributors to Ms. Curry similarly situated to persons contributing to her Republican and Democratic opponents?

2.   If the contributors are similarly situated, what is the appropriate level of scrutiny?

3.   Depending on the appropriate level of scrutiny, is the State's purpose sufficiently important and is the statutory classification sufficiently connected to that purpose?

In addressing these questions, we conclude:

1.   Contributors to Ms. Curry's campaign are similarly situated to contributors supporting her Republican and Democratic opponents.

2.   Because the statutory classification affects a fundamental right, the right to political expression, we apply a standard that is at least as rigorous as the standard applied under the First Amendment.

3.   Under this standard, the statutory classification would fail.

### A.  Standard of Review

All parties sought summary judgment, and the district court granted the Defendants' motion and denied the Plaintiffs' motion.  For both rulings, we engage in *de novo* review.  *Constitution Party of Kan. v. Kobach*, 695 F.3d 1140, 1144 (10th Cir. 2012).  And in considering the district court's rulings on both motions, we view the

5

evidence in the light most favorable to the non-movant and determine whether that party is entitled to judgment as a matter of law. *Id.*

B. **Determining Whether Ms. Curry's Contributors Are Similarly Situated to the Contributors Supporting Her Republican and Democratic Opponents**

The threshold issue is whether the "disfavored parties" (contributors to Ms. Curry's campaign) are similarly situated to the "favored parties" (contributors to the Republican and Democratic nominees). We conclude that the favored and disfavored contributors are similarly situated.

We must begin by determining the meaning of the phrase, "similarly situated." The contributors are considered "similarly situated" if they are alike in "'all relevant respects.'" *Coal. for Equal Rights, Inc. v. Ritter*, 517 F.3d 1195, 1199 (10th Cir. 2008) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). Contributors to the legislative race were alike "in all respects" because no relevant distinctions existed between an individual wanting to donate money to Kathleen Curry and another individual wanting to donate to Ms. Curry's opponent.

The Defendants argue to the contrary, but they confuse:

● the contributors with their preferred candidates, and

● the state constitution with the statute being challenged.

The Defendants do not question the similarities among the contributors. Instead, the Defendants focus on the candidates, saying that Ms. Curry and her opponents are not similarly situated. Perhaps the Defendants are right, for the Republican and Democratic candidates had to run in primaries and Ms. Curry did not. But the equal-protection claim

6

was asserted by the contributors, not Ms. Curry. They simply want to contribute to their preferred candidate.

The Defendants' distinction also confuses the Colorado Constitution with the Colorado statute. Focusing on the Colorado Constitution, the Defendants insist that the Republican and Democratic candidates had primaries and the write-in candidate (Ms. Curry) didn't have a primary. Thus, the Defendants argue that the State should be able to set different contribution limits for candidates running in primaries and those not running in primaries. But this argument confuses the state constitution with the state statute being challenged.

The Plaintiffs stated in oral argument that they are not challenging the Colorado Constitution. Instead, the Plaintiffs confine their challenge to the Colorado statute. This statute does *not* set contribution limits based on who has a primary and who doesn't. Instead, the statute blurs the distinction by allowing Republican and Democratic candidates to collect and spend the entire $400 after the primary. Thus, a Republican or Democratic candidate can obtain $400 from a single contributor and spend all of the money in the general election. For the same general election, a write-in candidate can obtain only $200 from a single contributor.

To illustrate: Assume that three individuals want to make all of their potential contributions one week after the primaries and that each individual would support a different candidate. The supporter of Ms. Curry could contribute only $200, but supporters of Ms. Curry's opponents could contribute twice as much. How are the supporters different aside from their political preferences? According to the Defendants,

the supporters are different because the Republican and Democratic nominees had to win a spot on the general-election ballot through a primary and Kathleen Curry did not. But the Defendants' distinction (based on who has a primary and who doesn't) has nothing to do with the statutory classification, which creates different contribution limits after the primary has already ended.

Without any meaningful differences between the three contributors, we conclude that they are similarly situated.

### C.     Determining the Appropriate Level of Scrutiny

With this conclusion, we must determine the appropriate level of scrutiny.

Courts ordinarily scrutinize statutory classification under a deferential test, called "rational basis." *See Riddle v. Mondragon*, 83 F.3d 1197, 1207 (10th Cir. 1996). Exceptions exist for statutory classifications that turn on suspect differences (such as race) or that affect a fundamental right. *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1109 (10th Cir. 2008). In these circumstances, we would ordinarily apply strict scrutiny. *Id.*

The district court declined to apply strict scrutiny, reasoning that the contributors did not belong to a suspect class and that all contributors were treated alike because the same limitations applied to candidates running in a primary. We conclude that the district court should have applied greater scrutiny to the statutory classification.

It is true that the statute does not differentiate between contributors based on a suspect classification such as race. But the statute does classify contributors in a way that impinges on a fundamental right—the right to contribute as a form of political expression. *See Meyer v. Grant*, 486 U.S. 414, 420 (1988); *see also Buckley v. Valeo*,

8

424 U.S. 1, 23 (1976) (per curiam) (stating that the law imposed contribution limitations that "implicate[d] fundamental First Amendment interests").

The district court did not question the fundamental nature of this right. Instead, the court reasoned that Colo. Rev. Stat. § 1-45-103.7 had not treated individuals contributing to Ms. Curry any differently than the individuals contributing to the Republican and Democratic candidates. This reasoning is incorrect. After the primary, a supporter of Ms. Curry could give her only $200. At the same time, others could contribute $400 each to the Republican and Democratic candidates, and the candidates could spend that money in the general election. In this way, the statute treated contributors differently based on the political affiliation of the candidate being supported. And by treating the contributors differently, the statute impinged on the right to political expression for those who support Ms. Curry or other nominees who are unable to obtain funds prior to nomination.

As a result, we conclude that the statutory classification impinged on a fundamental right.

### D.    Strictly Scrutinizing the Statutory Classification

This conclusion would ordinarily require us to apply strict scrutiny. *See Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 666 (1990) ("Because the right to engage in political expression is fundamental to our constitutional system, statutory classifications impinging upon that right must be narrowly tailored to serve a compelling governmental

interest");[4] *see also Police Dep't v. Mosley*, 408 U.S. 92, 101 (1972) ("The Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives."). Generally, this scrutiny involves two inquiries:

- whether the State's asserted interest is compelling, and

- whether the means chosen are narrowly tailored to advance that interest.

*Price-Cornelison v. Brooks*, 524 F.3d 1103, 1109 (10th Cir. 2008).

In the First Amendment context, the Supreme Court has applied a less rigorous test for contribution limits, examining whether they are closely drawn to a sufficiently important governmental interest. *See, e.g., Randall v. Sorrell*, 548 U.S. 230, 247 (2006). For the sake of argument, we can assume that this form of intermediate scrutiny applies when contributors challenge contribution limits based on the Fourteenth Amendment's Equal Protection Clause rather than the First Amendment. Even under this form of intermediate scrutiny, however, the state officials would bear the burden of proof. *See Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 387-88 (2000).

The Defendants rely solely on the State's interest in preventing corruption or the appearance of corruption. This interest is sufficiently important. *See Buckley v. Valeo*, 424 U.S. 1, 67-68 (1976) (per curiam). But this interest has little to do with Colorado's statutory distinction among contributors.

---

[4] In 2010, the Supreme Court overruled a separate part of *Austin*. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 347-65 (2010). But the Court has not overruled the equal-protection analysis in *Austin*. *See Iowa Right to Life Comm., Inc. v. Tooker*, 717 F.3d 576, 603 (8th Cir. 2013) (following *Austin*'s equal-protection analysis (because it had not been overruled) to determine the constitutionality of a classification involving a ban on political contributions).

In evaluating the connection to the statutory distinction, we must determine whether it is closely drawn to advance the State's interest in preventing corruption or the appearance of corruption. We conclude that the means chosen are ill-conceived to advance these interests.

The statutory classification might advance the State's asserted interest if write-ins, unaffiliated candidates, or minor-party nominees were more corruptible (or appeared more corruptible) than their Republican or Democratic opponents. But the Defendants have never made such a suggestion. In the absence of a link between the differing contribution limits and the battle against corruption, the means chosen are not closely drawn to the State's asserted interest.

Rather than tie the statute to the anticorruption goal, the state officials argue that Republican and Democratic candidates must frequently spend money before the primary to "clear the field" of others wanting the nomination. In contrast, write-ins, unaffiliated candidates, and minor-party candidates need not clear the field of rivals; thus, these candidates arguably need less funds than their Republican or Democratic opponents before earning a place on the general-election ballot.

But this arguable distinction does not affect our inquiry. The state officials do not rely on the cost of a primary as a separate governmental interest. Instead, the officials rely solely on the State's asserted interest in fighting corruption. And that interest is not advanced by a law that allows Republicans or Democrats to collect larger donations than write-ins, unaffiliated candidates, or minor-party nominees. *See Russell v. Burris*, 146 F.3d 563, 571-72 (8th Cir. 1998) (holding that a statute was not narrowly tailored to

11

combat corruption when it allowed some political action committees to contribute 2.5 times the amount that most others could contribute).

The statute creates a basic favoritism between candidates vying for the same office. Ms. Curry's campaign provides a vivid example. Ms. Curry, as a write-in, had no opponent until she earned a place on the general-election ballot. The same was true of the Republican and Democratic nominees, for they were unopposed in their primaries. Unlike Ms. Curry, however, the Republican and Democratic candidates could collect $400 after earning a place on the general-election ballot. In contrast, Ms. Curry could collect only $200.

This classification does what the Supreme Court has never countenanced: It creates different contribution limits for individuals running against one another. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 738 (2008) ("We have never upheld the constitutionality of a law that imposes different contribution limits for candidates who are competing against each other . . . ."). These discriminatory limits are not closely drawn to the State's interest in battling corruption or the appearance of corruption. As a result, the classification does not survive strict scrutiny.

The Supreme Court addressed similar circumstances in *Davis v. FEC*, 554 U.S. 724 (2008). There, the Court addressed a First Amendment challenge to a law that allowed candidates to obtain more from individual contributors when an opponent had spent more than $350,000 in personal funds. *Davis*, 554 U.S. at 728, 736. The Court struck down the law on First Amendment grounds, holding that the classification between candidates was not closely drawn to the stated interest in preventing corruption or the

12

appearance of corruption. *Id.* at 737-44. Though a uniform contribution limit would have been constitutional, the Court noted its difficulty in imagining how Congress would advance its "anticorruption goals" by creating more severe contribution limits for candidates financing their own campaigns. *Id*. at 741. Ultimately, the law failed because it imposed "different contribution . . . limits on candidates vying for the same seat." *Id*. at 743-44.

Though the Court rested on the First Amendment rather than on the right to equal protection,[5] the rationale applies with even greater force here. *See* Richard Briffault, Davis v. FEC: *The Roberts Court's Continuing Attack on Campaign Finance Reform*, 44 Tulsa L. Rev. 475, 488 (2009) (discussing the *Davis* Court's emphasis on equality, such as the references to "'discriminatory fundraising limitations,'" "'fundraising advantages for opponents,'" and "'the unprecedented step of imposing different contribution and coordinated party expenditure limits on candidates vying for the same seat'" (footnotes omitted)).

Because the constitutional issue involved the First Amendment, the *Davis* Court focused on whether the classification was closely drawn to the government's anticorruption goal. *Davis*, 554 U.S. at 737-44. Here we have the same statutory anomaly of candidates running against each other with different contribution limits, and the disparity is not closely drawn to the asserted interest in fighting corruption or its

---

[5] The Court declined to address the equal-protection claim in light of the decision to strike down the law on First Amendment grounds. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 744 n.9 (2008).

appearance. As a result, we follow the teaching of *Davis* and hold that the statutory classification is unconstitutional because it is not closely drawn to the State's anticorruption goal.

## IV. Conclusion

We do not suggest that the constitution would forbid any contribution limits based on an election cycle. But here the State of Colorado has created different contribution limits for candidates running against each other, and these differences have little to do with fighting corruption. Indeed, even now, the Defendants have failed to articulate how the statutory classification advances Colorado's interest in preventing corruption. Thus, we conclude that the statutory classification violates the right to equal protection for individuals wishing to contribute to write-ins, unaffiliated candidates, and minor-party candidates when each candidate runs unopposed for the nomination.

In these circumstances, the district court erred in granting summary judgment to the Defendants. Instead, summary judgment should have been awarded to the Plaintiffs. Accordingly, we reverse and remand with instructions to vacate the judgment and to award summary judgment to the Plaintiffs on their as-applied claim under the Fourteenth Amendment's Equal Protection Clause.

13-1108, *Riddle v. Hickenlooper*

**GORSUCH**, Circuit Judge, concurring.

I confess some uncertainty about the level of scrutiny the Supreme Court wishes us to apply to this contribution limit challenge, but I harbor no question about the outcome we must reach. My colleagues are surely right that, as applied, Colorado's statutory scheme offends the Constitution's equal protection guarantee, whatever plausible level of scrutiny we might deploy. At the same time, it's no less clear to me that, with a little effort, Colorado could have achieved its stated policy objectives (and might still) without offending the national charter.

\*

In at least one important way Colorado discriminates against minor party contributors. An example illustrates the problem: contributors to state legislative races can make two separate $200 contributions ($400 in all) to major party candidates who face no primary opposition. One of these $200 contributions may be nominally attributed to the (uncontested) primary, the other to the general election, but under Colorado's statutory scheme *all* the money can be spent in aid of the general election contest. Meanwhile, contributors to minor party candidates who face no opposition for their party's nomination can make only one $200 contribution. So it is that, in the particular situation we face, major party contributors can channel twice as much money to their favorite candidate in the general election as minor party contributors can.

The minor party contributors who bring this equal protection challenge suggest (at least in places) that we should consider applying strict scrutiny to this particular aspect of Colorado's statutory scheme. They say that contributing in elections implicates a fundamental liberty interest, that Colorado's scheme favors the exercise of that fundamental liberty interest by some at the expense of others, and for this reason warrants the most searching level of judicial scrutiny. For my part, I don't doubt this line of argument has much to recommend it. The trouble is, we have no controlling guidance on the question from the Supreme Court. And in what guidance we do have lie some conflicting cues.

No one before us disputes that the act of contributing to political campaigns implicates a "basic constitutional freedom," one lying "at the foundation of a free society" and enjoying a significant relationship to the right to speak and associate — both expressly protected First Amendment activities. *Buckley v. Valeo*, 424 U.S. 1, 25 (1976) (per curiam). Even so, the Court has yet to apply strict scrutiny to contribution limit challenges — employing instead something pretty close but not quite the same thing. *See id.* (using a "closely drawn" rather than a strict scrutiny standard); *Davis v. FEC*, 554 U.S. 724, 740 n.7 (2008); *Republican Party of N.M. v. King*, No. 12-2015, slip op. at 8-9 (10th Cir. Dec. 18, 2013). Some have questioned whether contribution limits *should* be subject to strict scrutiny. *See, e.g.*, *Randall v. Sorrell*, 548 U.S. 230, 266-67 (2006) (Thomas, J., concurring in the judgment); *Buckley*, 424 U.S. at 241-45 (Burger, C.J., concurring in part

2

and dissenting in part). The Court itself now has under consideration a case in which it may (or may not) choose to address the question. *See McCutcheon v. FEC*, 133 S. Ct. 1242 (2013) (noting probable jurisdiction in a challenge to aggregate contribution limits; oral argument was held October 8, 2013). But, to date at least, the Court hasn't gone so far. *See Citizens United v. FEC*, 558 U.S. 310, 359 (2010).

Of course, all these teachings have come in the context of *First Amendment* challenges to contribution limits — and in this appeal we are asked to decide a *Fourteenth Amendment* claim. In the Fourteenth Amendment's equal protection context, the Supreme Court has clearly told us to apply strict scrutiny not only to governmental classifications resting on certain inherently suspect grounds (paradigmatically, race) but also governmental "classifications affecting fundamental rights." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Still, some thoughtful judges have questioned whether it is appropriate to lift what is an admittedly "fundamental right" found in the First Amendment and analyze its infringement here, in the Fourteenth Amendment context, shorn of what the Court has said about the appropriate level of scrutiny applicable to that right in its native doctrinal environment. Isn't the nature of the interest at issue (its "fundamental-ness") closely tied to the level of scrutiny afforded that interest in its doctrinal home? Can an interest become more potent ("more" fundamental) when viewed through the lens of equal protection analysis? *See, e.g.*, *Wagner v.*

3

*FEC*, 854 F. Supp. 2d 83, 95-97 (D.D.C. 2012) (Boasberg, J.); *Ill. Liberty PAC v. Madigan*, 902 F. Supp. 2d 1113, 1125-26 (N.D. Ill. 2012) (Feinerman, J.).

To these questions, I can imagine this (potential) reply. The plaintiffs before us don't complain that Colorado's contribution limits violate their First Amendment rights because, say, the limits are too low for everyone. Instead, they complain that the State's contribution limits violate the Fourteenth Amendment's equal protection guarantee by *discriminating* against minor party contributors. And whatever level of scrutiny should apply to *equal* infringements of the right to contribute in the First Amendment context, the strictest degree of scrutiny is warranted under Fourteenth Amendment equal protection doctrine when the government proceeds to *discriminate* against some persons in the exercise of that right. On this account, there is something distinct, different, and more problematic afoot when the government *selectively* infringes on a fundamental right. *Cf. Davis*, 554 U.S. at 743-44 (suggesting that even in the First Amendment context "imposing different contribution . . . limits on candidates vying for the same seat" may call out for especially heightened scrutiny).

*

While there may be room in this case to debate the appropriate level of scrutiny, there's no room to debate the outcome. The various tiers of scrutiny that occupy so much attention in contemporary constitutional litigation — rational basis, strict scrutiny, something(s) in between — may sometimes provide

4

important heuristic help by illuminating the underlying question whether the State has violated the text of the Equal Protection Clause (or the First Amendment or some other constitutional guarantee). But this isn't one of those cases. *Whatever* level of scrutiny one might reasonably apply here — even spotting (without in any way granting) Colorado its wish that we lift *Buckley*'s somewhat more relaxed level of scrutiny from its First Amendment home and plunk it down into this Fourteenth Amendment equal protection setting — the State's statutory scheme still pretty clearly flunks.

In *Buckley*, the Supreme Court held that contribution limits must be "closely drawn to avoid unnecessary abridgement of associational freedoms." 424 U.S. at 25. But the Court also recognized that a state's interest in preventing political corruption and its appearance can (sometimes) satisfy this standard. *See id.* at 25-29; *Citizens United*, 558 U.S. at 345. Recognizing this line of defense may represent its best available lifeline, Colorado insists in its brief (though ever so briefly, just one paragraph in all) that its regulatory scheme is all about warding off corruption, or at least corruption's appearance. Yet the State never even tries to tell us *how* those interests might be served by a scheme that discriminates in favor of major party contributors. Let alone introduce evidence to support such an argument. All we have is one stray, if insistent, assertion found in a lawyer's brief.

5

To be sure, Colorado tries a separate line of defense, suggesting that its discriminatory contribution scheme is justified not only because of corruption but also because of cost. Under Colorado law, major party candidates must always participate in primaries. Even when unchallenged. Meanwhile, under Colorado law minor parties may not conduct primaries when only one candidate seeks the nomination. Because even unchallenged primaries can be expensive, the State reasons, major party candidates who face no challenge for the nomination need and deserve more money than similarly situated minor party counterparts.

This argument bears no shortage of curiosities, but consider just these two. First, can a state really justify unequal treatment because of a "problem" of its own creation? After all, to the extent unchallenged major party candidates may incur more costs because they have to participate in primaries (an essential factual premise for which Colorado has identified no evidence in our record), that's only because state statutory law *requires* them to do so. Second, what does the State's proffered rationale have to do with the rule it seeks to defend? Even if we accept for argument's sake the notion that major party candidates "need" more money to secure their parties' nominations because of the primary election process, that speaks only to the *primary* election. Meanwhile, the challenge in this case focuses on the fact Colorado's regulatory regime allows major party contributors greater influence in the *general* election. The State's rationale and rule just don't jibe: it supplies a *possible* rationale for higher contribution limits for major party

6

candidates at the *primary* election stage but the challenge in this case focuses on the fact the State effectively allows higher contributions to major party candidates at the *general* election stage.

When it really comes down to it, the only reason I can imagine for Colorado's challenged regulatory scheme is a bald desire to help major party candidates at the expense of minor party candidates. Whether that rationale could save Colorado's scheme seems to me highly doubtful. Of course, the Supreme Court has suggested that states may enact "reasonable election regulations" designed to foster a two-party system. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 367 (1997). But the Court has never gone so far as to suggest the states may pursue that interest by discriminating against contributors based on their political allegiances. *Cf. id.* (a state's interest in a two-party system "does not permit [it] to completely insulate the two-party system from minor parties' or independent candidates' competition and influence"). Neither has Colorado had the audacity to suggest that we should uphold its regime on this basis — and when deciding whether a law satisfies strict scrutiny or *Buckley*'s slightly less demanding standard, this court is obliged to assess the law only in light of the interests the State has sought to pursue, not those it hasn't. *See, e.g.*, *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 387-88 (2000) ("[U]nder *Buckley*'s standard of scrutiny, a contribution limit involving significant interference with associational rights could survive if *the Government demonstrated* that

7

contribution regulation was closely drawn to match a sufficiently important interest." (emphasis added) (citations and quotation marks omitted)).

\*

Having said this much, it is worth pausing to emphasize what isn't said in these pages. Nothing in what I've suggested or what the court holds intimates that Colorado must adopt a per-election-cycle rather than a per-election approach to the regulation of campaign contributions. The State represents that its constitution requires some sort of statutory scheme regulating campaign contributions on a per-election basis (disaggregating primary and general election contributions and capping them separately) rather than on a per-cycle basis (aggregating the two steps in one overall contribution limit). If we strike down its current statutory regime, Colorado says it worries its constitutional command may be imperiled too. But such fears are misplaced. The fact that Colorado's current statutory per-election scheme runs afoul of the federal equal protection guarantee doesn't mean all will. The federal government regulates campaign contributions on a per-election basis and manages to do so without any of the discrimination found in Colorado statutory law. Perhaps the State might follow this model or some other. What we hold today is limited but no less essential for it: a state cannot adopt contribution limits that so clearly discriminate against minority voices in the political process without some "compelling" or "closely drawn" purpose — and Colorado has articulated none.

8