21-2518 (L)
*Upstate Jobs Party v. Kosinksi*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2022

(Argued: Wednesday May 10, 2023        Decided: July 3, 2024)

Nos. 21-2518, 21-2557

———————————————————

UPSTATE JOBS PARTY, MARTIN BABINEC, JOHN BULLIS,

*Plaintiffs-Appellees-Cross-Appellants,*

-v.-

PETER S. KOSINSKI, NEW YORK STATE BOARD OF ELECTIONS CO-CHAIR COMMISSIONER, IN HIS OFFICIAL CAPACITY, HENRY T. BERGER, NEW YORK STATE BOARD OF ELECTIONS CO-CHAIR COMMISSIONER, IN HIS OFFICIAL CAPACITY, ESSMA BAGNUOLA, NEW YORK STATE BOARD OF ELECTIONS COMMISSIONER, IN HER OFFICIAL CAPACITY, ANTHONY J. CASALE, NEW YORK STATE BOARD OF ELECTIONS COMMISSIONER, IN HIS OFFICIAL CAPACITY,

*Defendants-Appellants-Cross-Appellees.*[*]

———————————————————

Before:        LIVINGSTON, *Chief Judge*, RAGGI, and NARDINI, *Circuit Judges*.

---

[*] The Clerk of Court is respectfully directed to amend the caption to conform to the above.

Plaintiffs-Appellees-Cross-Appellants Upstate Jobs Party ("Upstate Jobs") and two of its leaders (collectively, "UJP") sued Defendants-Appellants-Cross-Appellees, Commissioners of the New York State Board of Elections (collectively, the "State Board"), over campaign finance regulations that allow parties—which, by definition, have demonstrated a certain level of statewide support—to accept and transfer campaign contributions in ways that non-party candidate-nominating organizations (*i.e.*, "independent bodies") cannot. Upstate Jobs, an independent body, claims that it is similarly situated to parties because both itself and parties nominate candidates that compete in the same elections. As such, UJP contends that New York's preferential treatment of parties violates the Fourteenth Amendment right to equal protection. Upstate Jobs and Martin Babinec, its founder, also assert First Amendment violations, alleging that New York's campaign finance rules distinguishing between parties and independent bodies are not closely drawn to a sufficient state interest in preventing corruption or the appearance thereof.

On cross-motions for summary judgment, the United States District Court for the Northern District of New York (Suddaby, *C.J.*) determined that differences in contribution limits applicable to parties and independent bodies violate the Fourteenth and the First Amendments. The district court separately determined that allowing parties but not independent bodies to maintain so-called "housekeeping accounts" did not violate either amendment. UJP and the State Board both appealed. Because parties and independent bodies are not similarly situated, we **REVERSE** in part and **AFFIRM** in part the district court's judgment as to the Fourteenth Amendment claims. And, because the state's contribution limits and housekeeping account exception are closely drawn to serve the state's anticorruption interests, we **REVERSE** in part and **AFFIRM** in part the district court's judgment as to the First Amendment claims.

FOR PLAINTIFFS-APPELLEES-CROSS-APPELLANTS:

> SHAWN TOOMEY SHEEHY (Edward Wenger & Phillip Michael Gordon, *on the brief*), Holtzman Vogel Baran Torchinsky & Josefiak, PLLC, Haymarket, VA; Michael Burger, Santiago Burger LLP, Rochester, NY, *on the brief*.

2

FOR DEFENDANTS-APPELLANTS-CROSS-APPELLEES:

SARAH L. ROSENBLUTH, Assistant Solicitor General (Jeffrey W. Lang, Deputy Solicitor General, *on the brief*), *for* Letitia James, Attorney General of the State of New York, Albany, NY.

DEBRA ANN LIVINGSTON, *Chief Judge*:

In this appeal, a political organization known as Upstate Jobs Party ("Upstate Jobs"), as well as its founder, Martin Babinec, and its Chairman and Executive Director, John Bullis, seek declaratory and injunctive relief, alleging that various New York election campaign finance laws violate the First and Fourteenth Amendments. Specifically, Upstate Jobs and its leaders (collectively, "UJP") challenge New York campaign finance laws that distinguish between political parties, which must demonstrate a particular level of statewide support to qualify as such, and independent bodies, which are defined as all candidate-nominating groups that do not qualify as political parties. Due to this statutory distinction, independent bodies such as Upstate Jobs can neither accept individual contributions as large as those that parties can accept, nor transfer as much money to their candidates as parties can transfer. In addition, New York law provides a "housekeeping account" exception to contribution limits, allowing parties, but not

3

independent bodies, to accept unlimited contributions for maintaining permanent headquarters, employing staff, and other activities that are not for the express purpose of promoting candidates. According to UJP, such unequal treatment violates the Fourteenth Amendment's Equal Protection Clause, as well as the First Amendment rights of Upstate Jobs and its supporters.

The district court determined that the contribution limit distinctions were supported by New York's legitimate interest in stanching corruption but were neither closely drawn nor the least restrictive means of achieving this aim. Thus, the district court granted UJP's requested relief as to contribution limits under both the First Amendment and the Fourteenth Amendment. However, after determining that the housekeeping exception *was* closely drawn and the least restrictive means of achieving the state's anticorruption goals, the district court denied UJP's requested relief as to housekeeping accounts under both the First Amendment and the Fourteenth Amendment.

The district court erred in multiple respects. First, UJP's Fourteenth Amendment challenges—as to both the contribution limits and the housekeeping exception—falter at the threshold. Political parties and independent bodies are not similarly situated merely because they may both nominate candidates to run

4

in the same election.   Accordingly, UJP has not shown an equal protection

violation.   Second, as to the First Amendment challenges, New York has

sufficiently demonstrated that its contribution limits and the absence of a

housekeeping account exception for independent bodies are supported by a

substantial anticorruption objective and are closely drawn to serve that goal.   As

a result, the state's campaign finance laws withstand all constitutional challenges

raised below, and we **AFFIRM** in part and **REVERSE** in part accordingly.

## BACKGROUND

### I. New York Election Law

Under New York law, a political organization becomes a "party" when its

gubernatorial and presidential candidates in the last preceding election received

the greater of 130,000 votes or two percent of the total votes cast.   N.Y. Elec. Law

§ 1-104(3).[1]   All other organizations that nominate electoral candidates but do not

---

[1] The definition of "party" reads, in full:

> [A]ny political organization which, excluding blank and void ballots, at the last preceding election for governor received, at least two percent of the total votes cast for its candidate for governor, or one hundred thirty thousand votes, whichever is greater, in the year in which a governor is elected and at least two percent of the total votes cast for its candidate for president, or one hundred thirty thousand votes, whichever is greater, in a year when a president is elected.

qualify as parties are "independent bodies." *Id.* § 1-104(12) (defining "independent body" as "any organization or group of voters which nominates a candidate or candidates for office to be voted for at an election, and which is not a party as herein provided"). Typically, an independent body functions as the "alter ego of a candidate," App'x 81, existing only because a candidate decided to run as an independent. In other words, independent bodies usually lack "a distinct identity . . . that is separate and apart from the candidate." *Id.* at 82. Thus, in broad terms, New York has enacted a regulatory scheme for political organizations that demonstrate a baseline level of statewide support (*i.e.*, parties) that is distinct from campaign finance rules that apply to all other individuals and organizations that nominate candidates for elections (*i.e.*, independent bodies).[2]

---

N.Y. Elec. Law § 1-104(3).

[2] As of February 21, 2020—around when the parties filed their cross-motions for summary judgment below—New York recognized eight parties: Democratic, Republican, Conservative, Working Families, Green, Libertarian, Independence, and SAM. *See Upstate Jobs Party v. Kosinski*, 559 F. Supp. 3d 93, 111 (N.D.N.Y. 2021); App'x 241. In April 2020, New York amended its party-qualification requirements, which previously conferred party status on organizations that won at least 50,000 votes, to the current requirement that the organization won the greater of 130,000 votes or two percent of the total vote in the preceding election. *See SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 272 (2d Cir. 2021). As of May 22, 2024, New York recognizes four parties: Democratic, Republican, Conservative, and Working Families. *See* N.Y. Bd. of Elections in the City of N.Y., Party Affiliation, https://www.vote.nyc/page/party-affiliation.

6

Attaining party status unlocks a suite of statutory provisions that confer benefits and impose organizational and administrative obligations. *See SAM Party of N.Y.*, 987 F.3d at 271–72. A "principal privilege[] of party status is a designated ballot line or 'berth.'" *Id.* at 271; *see also* N.Y. Elec. Law § 7-104(4). More relevant here, once an organization qualifies as a party, it may accept larger contributions from individuals, *see* N.Y. Elec. Law §§ 14-114(1), 14-114(10), make uncapped transfers to party candidates, *see id.* §§ 14-100(9)(2), 14-100(10), 14-114(3), and accept unlimited contributions to housekeeping accounts for expenses "on ordinary activities which are not for the express purpose of promoting the candidacy of specific candidates," *see id.* § 14-124(3). These benefits come with associated burdens, including requirements to file rules concerning party governance with the state and county boards of elections, N.Y. Elec. Law § 2-114; to create a state committee composed of enrolled party members elected biannually, *id.* §§ 2-102, 2-106; to form county committees in each of New York's 62 counties, typically by electing two or more party members in each election district within each county, *id.* § 2-104; to file information regarding the officers of state and county committees with the state and county boards of elections, *id.* § 2-112(d); to afford certain due process protections before removing party officers or

7

members, *id.* § 2-116; and to select nominees for election to public or party office through specified procedures, frequently primaries, *id.* §§ 2-106, 6-110.

Independent bodies, on the other hand, do not enjoy designated ballot berths; their candidates must obtain a specified number of signatures on an independent nomination petition to gain ballot access. *See id.* § 6-142. Independent bodies also must adhere to the same contribution limits that apply to individuals, *see id.* § 14-114(1), and the exception that permits parties to accept unlimited contributions to housekeeping accounts does not apply to them, *see id.* § 14-124(3). While independent bodies do not benefit from these party-specific regulations, they also do not bear the party-specific organizational and administrative burdens described above. And, like party supporters, the supporters of an independent body can establish campaign finance vehicles such as a political action committee ("PAC") or an independent expenditure committee ("IEC"), which may receive unlimited individual contributions subject to some parameters.[3]

---

[3] PACs can receive unlimited individual contributions, subject to limitations on the contributions they can make to a candidate based on the limitation applicable to that candidate. N.Y. Elec. Law § 14-114. IECs can also receive unlimited contributions from individuals and make unlimited independent expenditures but may not coordinate with a campaign and are limited in how they can expend funds. *Id.* §§ 14-100(15), 14-107(1)(a), 14-107(4), 14-107-a. A candidate may also designate a political committee,

At issue in this case are two elements of New York's campaign finance regime that distinguish between parties and independent bodies: contribution limits and the housekeeping account exception to those limits. As to the first, New York law establishes different individual contribution limits for parties and independent bodies. Parties may receive contributions up to $138,600 from an individual annually. 9 N.Y.C.R.R. § 6214.0.[4] By contrast, contribution limits to independent bodies "depend on how the [entity] is organized for campaign finance purposes" and most often track the individual contribution limits for the office the candidate seeks. *See* App'x 158–59. For instance, Upstate Jobs averred in its complaint that it intended to field a gubernatorial candidate, meaning it could only accept individual contributions up to $9,000, consistent with the general individual contribution limit for statewide general elections. *See* N.Y. Elec. Law § 14-114(1).[5] A second component of these contribution limits pertains

___

known as an "authorized committee," "to receive contributions and make expenditures in support of the candidate's campaign for such election." *Id.* § 14-200-a(1).

[4] At the time the parties briefed this case, the individual contribution limit to parties was $117,300. This limit has since been adjusted upward to account for inflation. *See* N.Y. Elec. Law § 14-114(10)(b).

[5] In November 2022, after this case was fully briefed, New York launched a new public campaign financing program that extended public matching funds and lowered individual contribution limits to candidates for statewide office. *See* N.Y. State Pub. Campaign Fin. Bd., Public Campaign Finance Program, https://pcfb.ny.gov/program-

to the amount of money that parties or independent bodies can, in turn, transfer to candidates. Under New York law, parties may transfer unlimited funds to their candidates, whereas independent bodies may transfer funds only up to the same contribution limits generally applicable to a particular office. *See id.* §§ 14-100(9)(2), 14-100(10), 14-114(3).

Second, parties enjoy an exception to contribution limits for donations received and spent "to maintain a permanent headquarters and staff and carry on ordinary activities which are not for the express purpose of promoting the candidacy of specific candidates." *Id.* at § 14-124(3). These so-called "housekeeping" funds must be kept in a segregated bank account. *Id.* The housekeeping exception does not apply to independent bodies, which must abide by generally applicable contribution limits when allocating funds for headquarters and staff. *See id.* (applying the exception only to "party committee[s]").

**II. The Upstate Jobs Party**

In early 2016, Babinec campaigned for the Republican nomination in New York's 22nd Congressional District. Unable to garner support as a Republican,

overview. Before this new program, the maximum contribution limit to a statewide candidate, such as a gubernatorial candidate, was $47,100. 9 N.Y.C.R.R. § 6214.0; N.Y. Elec. Law § 14-114(1).

10

Babinec launched Upstate Jobs, a new independent body, and ran under its banner in a bid to disrupt the dominance of New York's two-party system. Aided by approximately sixty volunteers, Babinec obtained the requisite 3,500 signatures on independent nominating petitions to have his name added to the ballot as the Upstate Jobs candidate.[6] To assist his candidacy, Babinec lent his campaign $2,990,000 of personal funds. Ultimately, Babinec lost the election, receiving 34,638 votes—12.4% of the total votes cast.

In 2017, Upstate Jobs worked to raise its profile by promoting a platform to revitalize the upstate New York economy through the creation of middle-class private sector jobs. By the end of that year, Upstate Jobs was formally incorporated as Vote Upstate Jobs, Inc., a nonprofit entity organized under § 501(c)(4) of the Internal Revenue Code. Upstate Jobs also formed an independent expenditure committee called the Upstate Jobs Committee, to which Babinec contributed approximately $25,000 in 2017—all the money that the Committee received that year.

---

[6] For this race, the boards of elections of seven of the eight counties within the 22nd Congressional District chose to consolidate the Upstate Jobs Party ballot line with the Libertarian Party ballot line. As such, Babinec appeared on the Libertarian Party line with a notation in 3.5-point font acknowledging his affiliation with Upstate Jobs.

Upstate Jobs supported one candidate, Ben Walsh, for Mayor of Syracuse in 2017. Although Upstate Jobs did not make any contributions to Walsh's campaign, its volunteers helped him obtain the requisite number of signatures to appear on the ballot as the Upstate Jobs candidate.[7] The Upstate Jobs Committee, having received $25,000 in contributions that year (all from Babinec), made $22,074 in independent expenditures to support Walsh via digital media advertisements and mailers. Walsh won the election and is now the Mayor of Syracuse.

Upstate Jobs continued its efforts throughout 2018 and 2019, holding several public meetings and endorsing ten candidates from multiple political parties for various offices. For one candidate, Robert Antonacci, who ran as a Republican for State Senate in 2018, Upstate Jobs circulated enough independent nominating petitions to secure his appearance on an Upstate Jobs ballot line, where he received 347 votes.[8] That year, Upstate Jobs received $88,000 in contributions and spent $48,891 on consultants and other program expenses, leaving it with year-end net assets of $39,109. Over the course of 2018 and 2019, in addition to being Upstate

---

[7] Walsh appeared under the ballot lines for the Independence Party and the Reform Party. App'x 105. Walsh's affiliation with the Upstate Jobs Party was marked in 3.5-point font next to his name on the Reform Party line. *Id.*

[8] Upstate Jobs does not appear to have nominated any candidate since Mr. Antonacci.

Jobs' largest donor, Mr. Babinec contributed $240,898 to the Upstate Jobs Committee—essentially all of its contributions—which the committee spent on independent expenditures to support the candidates Upstate Jobs had endorsed. UJP contends that, if granted relief in this action, Babinec will contribute the party-level maximum to Upstate Jobs, Upstate Jobs will transfer sums of money to its candidates without regard for individual contribution limits, and Upstate Jobs will fundraise for a housekeeping account to obtain a permanent office space and to hire full-time employees.

Since its inception in 2016, Upstate Jobs' Board of Directors has consisted of three members: Babinec, Bullis, and Paul Allen. From 2017 through August 2019, these same individuals comprised the Board of Directors of the Upstate Jobs Committee. At present, Babinec is the only "overlapping board member, serving on the boards of both Upstate Jobs Party and Upstate Jobs Committee." App'x 228. Notwithstanding the multi-year period during which the entities shared the same board members, Upstate Jobs represents that the entities maintain distinct decision-making processes and that the Upstate Jobs Committee decides on independent expenditures consistent with a firewall policy that prevents coordination between itself and any Upstate Jobs candidate or campaign.

### III. The Proceedings Below

In April 2018, UJP commenced this action against Peter S. Kosinski, Douglas A. Kellner, Andrew J. Spano, and Gregory P. Peterson (collectively, the "State Board"), each of whom was, at the time, a Commissioner of the New York State Board of Elections.[9]   In its complaint, UJP claims that the provisions of New York law governing housekeeping accounts and contributions to and transfers from parties and independent bodies violate their First Amendment rights to free speech and free association as well as their Fourteenth Amendment right to equal protection.   As relief, UJP seeks a declaration that certain of New York's campaign finance rules are unconstitutional insofar as they (1) permit individuals such as Babinec to contribute $138,600 to parties but only $9,000 to independent bodies when supporting a gubernatorial candidate in a general election; (2) allow parties but not independent bodies to effectuate unlimited transfers of contributions to their candidates; and (3) authorize parties but not independent bodies to establish housekeeping accounts.   UJP also seeks a declaration that

---

[9] Douglas A. Kellner is no longer a Co-Chair Commissioner and has been replaced by Henry T. Berger.   Andrew J. Spano is no longer a Commissioner and has been replaced by Essma Bagnuola.   Gregory P. Peterson is no longer a Commissioner and has been replaced by Anthony J. Casale.

Upstate Jobs may raise and spend contributions on the same terms as parties and an injunction restraining the State Board from enforcing the challenged provisions of the New York Election Law against UJP.[10]

Along with filing the complaint, UJP moved for a preliminary injunction to permit Upstate Jobs to establish a housekeeping account, solicit contributions, and transfer funds to candidates on the same terms as parties for the then-upcoming 2018 gubernatorial election. The district court denied the preliminary injunction motion after determining that UJP failed to show a substantial likelihood of success on the merits. On appeal, we affirmed the district court's denial of preliminary injunctive relief but noted that UJP's claims "raise serious questions of free expression and equal treatment under the law, as well as the appropriate standard of judicial review." *Upstate Jobs Party v. Kosinski*, 741 F. App'x 838, 839 (2d Cir. 2018) (summary order).

Following discovery, the parties cross-moved for summary judgment. In October 2021, the district court issued an amended decision granting summary

---

[10] UJP also asserted a claim based on the sums that a party can raise for a primary election and carry over to a general election, further widening the financial disadvantage of independent bodies, which generally do not run in primary elections. UJP abandoned this claim by not seeking review on appeal.

judgment in favor of UJP as to the constitutionality of the differential contribution and transfer limitations between parties and independent bodies in general elections and granting summary judgment in favor of the State Board as to the constitutionality of party housekeeping accounts. *Upstate Jobs Party v. Kosinski*, 559 F. Supp. 3d 93, 140-41 (N.D.N.Y. 2021).[11]

The district court began its analysis by outlining the applicable legal standards for UJP's constitutional claims. For First Amendment freedom of speech and association challenges to contribution limits, the district court explained that the Supreme Court applies a less-than strict tier of scrutiny that is nevertheless rigorous. *Id.* at 128. Under this intermediate standard, a limitation on campaign contributions may be upheld "if the State demonstrates a sufficiently important interest and employs means *closely drawn* to avoid unnecessary abridgement of associational freedoms." *Id.* (quoting *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 197 (2014)). As to the Fourteenth Amendment equal protection challenge, the district court determined that UJP's equal protection

---

[11] The amended decision is identical to the district court's original decision, except for a footnote explaining why it was issued and a decretal paragraph permanently enjoining defendants from enforcing the challenged campaign contribution and transfer limits against UJP.

16

claims warranted a more exacting standard of review—that is, strict scrutiny—because the classification between political parties and independent bodies implicates fundamental rights (*i.e.,* the First Amendment rights to free association and speech). *Id.* at 128-29. Under strict scrutiny review, the district court recognized, a state must show that its regulations are the least restrictive means necessary to serve a compelling interest. *Id.*

Applying these standards to UJP's claims regarding New York's differential contribution limits, the district court determined that the state's interest in preventing *quid pro quo* corruption or the appearance thereof was sufficiently important under both the First and Fourteenth Amendments. *Id.* at 130–32. But the distinction between parties and independent bodies in those contribution limits was not, according to the district court, closely drawn to further that anticorruption interest. *Id.* at 136. The State Board adduced no evidence of enforcement actions against independent bodies for violating contribution limits and failed to explain why it would be insufficient to adopt UJP's proffered alternative regulations, such as disclosure requirements or antiproliferation rules. *See id.* at 133–35. Accordingly, the district court held that the restrictions violated the First Amendment. *Id.* at 136. The district court separately determined that

17

parties and independent bodies were similarly situated with respect to contribution limits, triggering strict scrutiny as to UJP's Fourteenth Amendment claims. *Id.* at 137. For the same reasons that it held the contribution limits were not closely drawn to New York's anticorruption interest, the district court also held that the limits were not the least restrictive means necessary to serving that interest and thus violated the Fourteenth Amendment. *Id.* at 137–38.

As to the housekeeping account exception, the district court deemed New York's anticorruption motivation to be a sufficiently important state interest for limiting the exception to parties. *Id.* at 138–39. The district court credited the concern that extending the housekeeping exception to include independent bodies would allow such organizations to raise unlimited funds that could be spent on "lavish perks, bonuses, or even expenditures that indirectly promote the candidacy of specific candidates," without the attendant regulatory infrastructure that governs parties. *Id.* at 139–40. This concern was particularly salient for an independent body like Upstate Jobs, whose founder, Babinec, served as a director of both the independent body and its independent expenditure committee and was "both entities' largest (and frequently only) donor." *Id.* at 139. The district court next found the exception's party-specific application to be closely drawn to

18

serving the state's interest, in accord with the First Amendment, and to be the least restrictive means of doing so, in accord with the Fourteenth Amendment. *Id.* at 139–40.

Based on the above reasoning, the district court entered a permanent injunction enjoining the State Board from enforcing the asymmetric contribution and transfer limits against Upstate Jobs and Babinec and granted the State Board summary judgment on the housekeeping exception claim. The parties timely appealed.

## DISCUSSION

Before this Court, the State Board appeals the portion of the district court's summary judgment decision holding that New York's asymmetric contribution and transfer limits violate the First and Fourteenth Amendments. UJP appeals the part of the district court's judgment upholding New York's housekeeping account exception.

"We review the district court's ruling on cross-motions for summary judgment *de novo*, in each case construing the evidence in the light most favorable to the non-moving party." *Panzella v. Sposato*, 863 F.3d 210, 217 (2d Cir. 2017) (citations omitted). As is well established, summary judgment is warranted

19

when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

At the start, we agree with the State Board that UJP's challenges to New York's campaign finance rules are properly construed as facial, not as-applied, challenges. The parties' disagreement on this point is relevant because "a plaintiff can only succeed in a facial challenge by establishing that no set of circumstances exists under which the [relevant legal provision] would be valid, *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (internal alteration, quotation marks, and citation omitted). Here, while Upstate Jobs seeks specific injunctive relief that would permit it to participate in future elections under the campaign finance rules currently applicable to parties, its constitutional arguments sweep beyond its own circumstances and call into question the campaign finance restrictions pertinent to all independent bodies. "The claim therefore seems 'facial' in that it is not limited to plaintiff's particular case, but challenges application of the law more broadly." *Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 127 (2d Cir. 2014) (quoting *Iowa Right to Life Comm., Inc. v. Tooker*, 717 F.3d 576, 588 (8th Cir. 2013)). As a result, we construe UJP's claims as

facial challenges to the pertinent features of the New York Election Law. *See id.* at 126–27 (explaining that a facial challenge involves claims and requested relief that "reach[es] beyond the particular circumstances of these plaintiffs") (citation omitted).

In any event, framing the claims as either facial or as applied is not outcome-determinative in this case. Upstate Jobs is typical of the small, closely held independent bodies that the State Board most often cites as raising legitimate corruption concerns. To this point, UJP does not dispute that Babinec is Upstate Jobs' "largest (and frequently only) donor," *see Upstate Jobs Party v. Kosinski*, 559 F. Supp. 3d at 139, nor that he provided nearly all the contributions ever made to the Upstate Jobs Committee, *see* App'x 219, 221, 223. UJP also does not dispute that Upstate Jobs has successfully nominated only three candidates, including Babinec, to appear on ballots as the organization's designated nominee, has never nominated more than a single candidate in an election cycle, *see id.* at 214-15, 221, nor that Babinec serves as a director of both Upstate Jobs and its IEC, *id.* at 228. In other words, if the challenged laws are facially constitutional, Upstate Jobs is not the type of independent body that could bring a successful as-applied claim.[12]

---

[12] We express no view here as to whether a different conclusion might obtain for

Thus, regardless of how we construe them, UJP's claims fail for the reasons explained below.

## I. Fourteenth Amendment

UJP claims that New York's contribution limits and the related housekeeping account exception violate the Fourteenth Amendment because they establish a two-tiered system favoring political parties that achieve statewide support over other candidate-nominating groups that do not. "To successfully assert an equal protection challenge, petitioners must first establish that the two classes at issue are similarly situated." *Yuen Jin v. Mukasey*, 538 F.3d 143, 158 (2d Cir. 2008); *see also Jankowski-Burczyk v. I.N.S.*, 291 F.3d 172, 176 (2d Cir. 2002) ("Of course, the government can treat persons differently if they are not 'similarly situated.'" (citation omitted)).

Fatal to UJP's equal protection claims, political parties and independent bodies with concentrated donor bases and leadership are not similarly situated with respect to the challenged election laws. Political parties have demonstrated

---

a differently composed and operated independent body, for example, one with numerous donors and more diffuse leadership, which nominated multi-candidate slates in consecutive election cycles.

22

a degree of statewide support that independent bodies, by definition, have not.[13]

*See* N.Y. Elec. Law § 1-104(3), (12). There are "obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other." *Buckley v. Valeo*, 424 U.S. 1, 97 (1976) (citation omitted). Given their broader base, New York parties must abide by a range of structural and operational requirements. Unrestrained by any such requirements, independent bodies can (and, according to the State Board's election law expert, "overwhelmingly" do) consist of no more than a handful of affiliated individuals banding together in support of a single candidate or issue. App'x 79–82. Indeed, as already noted, this appears to be the case with Upstate Jobs, which has a three-member board, one major donor, no office or employees, and which has never run more than one candidate at a time. *See* App'x 223, 221, 214–15.

---

[13] Because we conclude that political parties and independent bodies are not similarly situated, we need not reach the question of "whether it is appropriate to lift what is an admittedly 'fundamental right' found in the First Amendment and analyze its infringement here, in the Fourteenth Amendment context, shorn of what the Court has said about the appropriate level of scrutiny applicable to that right in its native doctrinal environment," *Riddle v. Hickenlooper*, 742 F.3d 922, 931 (10th Cir. 2014) (Gorsuch, *J.*, concurring).

The district court deemed parties and independent bodies to be "similarly situated" on the basis that the sole differentiator between the two is "the number of votes cast in a specific election," or, in other words, "their size." *Upstate Jobs Party*, 559 F. Supp. 3d at 137. This framing is incorrect. First, that a distinction between separate groups can be reduced to a single fact does not mean they are similarly situated—quite the contrary. *See, e.g.*, *Jankowski-Burczyk*, 291 F.3d at 177 (noting that "tax laws may separately classify couples who are married and those who are unmarried" and "treat [those two groups] differently"); *see also Schweiker v. Hogan*, 457 U.S. 569, 590 (1982) ("[I]n terms of their ability to provide for essential medical services, the wealthy and the poor are not similarly situated and need not be treated the same.").

Moreover, other important distinctions flow from a political organization's size under New York law. Organizations with enough support to achieve party status must comply with state requirements to file rules concerning party governance with the state and county board of elections, N.Y. Elec. Law § 2-114; create a state committee composed of enrolled party members elected biannually, *id.* §§ 2-102, 2-106; form county committees in each of New York's counties, typically by electing two or more party members in each election district within

each county, *see id.* § 2-104; file information regarding the officers of state and county committees with the state and county boards of elections, *id.* § 2-112(d); afford particular due process protections before removing party officers or members, *see id.* § 2-116; and select nominees for election to public or party office through specified procedures, frequently primaries, *see id.* §§ 2-106, 6-110. To comply with these requirements, political parties—but not independent bodies— must maintain substantial organizational infrastructure throughout the state. Thus, the New York legislature has created "obviously sensible and useful" classifications between political parties and independent bodies within a "ramified statutory scheme," *Jankowski-Burczyk*, 291 F.3d at 176, undermining Upstate Jobs's claim that, despite being a small independent body, it is similarly situated to a political party.

Further undercutting UJP's Fourteenth Amendment challenges, the Supreme Court rejected a similar claim in *California Medical Association v. Federal Election Commission*, 453 U.S. 182 (1981). As was relevant in that case, the Federal Election Campaign Act ("FECA") allowed corporations and labor unions to create and make unlimited contributions to segregated funds for political purposes. *Id.* at 200. Unincorporated associations, on the other hand, were limited in their

25

"contributions to . . . multicandidate political committee[s]." *Id.* Several unincorporated associations challenged this contribution cap under the Fifth Amendment's equal protection clause, arguing that "because contributions are unlimited in the former situation, they cannot be limited in the latter without violating equal protection." *Id.*

The Supreme Court rejected this argument. In doing so, the Court observed that FECA "as a whole impose[d] far *fewer* restrictions on individuals and unincorporated associations than it does on corporations and unions." *Id.* This differential treatment of the two groups "reflect[ed] a judgment by Congress that these entities have differing structures and purposes, and that they therefore may require different forms of regulation in order to protect the integrity of the electoral process." *Id.* at 201. The contribution limits here, and the housekeeping account exception, likewise reflect New York's judgment that parties and independent bodies require distinct treatment because they are distinct types of entities. Making that judgment does not itself deny independent bodies equal protection of the law.

UJP heavily relies on *Riddle v. Hickenlooper*, 742 F.3d 922 (10th Cir. 2014), in its argument to the contrary. There, the Tenth Circuit invalidated a Colorado

26

statute on equal protection grounds because it resulted in a disparity in the contributions that major and minor party candidates could receive in the same election. *See id.* at 924-25, 930. In effect, general election candidates who first ran in primaries could collect up to $400 from a single contributor, which could be spent before or after the primary, while a candidate without a primary was eligible to receive only half that amount from a single contributor. *See id.* at 924–25. The Tenth Circuit determined that contributors to a non-primary candidate were similarly situated to contributors to Republican and Democratic nominees because "no relevant distinctions existed between an individual wanting to donate money to [a write-in candidate] and another individual wanting to donate to [that write-in candidate's] opponent." *Id.* at 926. Focusing on the contributors who brought the claims, the court discerned no difference, aside from political preference, between an individual wishing to donate to a write-in candidate who did not run a primary and another wishing to donate to a Republican or Democrat. *See id.* at 926–27. The court acknowledged that the major party candidates might be differently situated than candidates who did not run in a primary, "for the Republican and Democratic candidates had to run in primaries and [the write-in candidate] did not." *Id.* at 926. However, the court concluded that this

27

argument was unavailing because the contributors—rather than the candidates or parties—had brought the equal protection challenge. *See id.* ("They simply want to contribute to their preferred candidate.").

The logic of *Riddle* is inapposite to this case. Most obviously, the plaintiffs here are the independent body and its leadership, not would-be contributors.[14] As explained above, independent bodies with concentrated donor bases and leadership that function as the alter ego of a candidate are not similarly situated to parties. Moreover, the challenged New York laws have not created different individual contribution limits for candidates running in the same election. Rather, regardless of party affiliation, all candidates may accept individual contributions up to the statutory cap for the type of election. While parties may separately receive contributions and transfer funds to candidates at higher levels than may independent bodies, New York drew this distinction in light of parties' demonstrated statewide backing and sizeable infrastructure.

At bottom, UJP insists that the Fourteenth Amendment requires treating independent bodies commensurate with the widely-supported organizations New

---

[14] Babinec, while a contributor to Upstate Jobs, did not assert a Fourteenth Amendment claim in that capacity. *See infra* note 21.

York recognizes as political parties, without the regulations and requirements that come with such recognition. If endorsed, this novel theory would effectively require New York to disregard salient differences between established political parties and small, oftentimes ad hoc organizations that routinely support a single candidate in a single election cycle. These distinctions, however, "serve[] important regulatory interests" and therefore do not violate the Fourteenth Amendment. *SAM Party*, 987 F.3d at 278.

## II. First Amendment

As to UJP's First Amendment claims, we recognize at the start that "[t]he judiciary owes special deference to legislative determinations regarding campaign contribution restrictions." *Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2011) (citing *Fed. Election Comm'n v. Beaumont*, 539 U.S. 146, 155 (2003), and *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 137 (2003)). At the same time, "[t]he First Amendment has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 302 (2022) (internal quotation marks and citation omitted). The broad protection the First Amendment affords to political speech "reflects our profound national commitment to the principle that debate on public issues should be uninhibited,

29

robust, and wide-open." *Id.* (citation omitted). Thus, "[w]hile paying deference, the judiciary must also protect the fundamental First Amendment interest in political speech." *Ognibene*, 671 F.3d at 182.

Balancing these considerations of democratic governance and constitutional rights, the Supreme Court has instructed that "contribution limitations are permissible as long as the Government demonstrates that the limits are 'closely drawn' to match a 'sufficiently important interest.'" *Randall v. Sorrell*, 548 U.S. 230, 247 (2006) (quoting *Buckley*, 424 U.S. at 25). Unlike expenditure limits, which implicate "core First Amendment rights of political expression" and thus require "exacting scrutiny," *McCutcheon*, 572 U.S. at 197 (quoting *Buckley*, 424 U.S. at 44-45), "contribution limits impose a lesser restraint on political speech because they 'permit the symbolic expression of support evidenced by a contribution but do not in any way infringe the contributor's freedom to discuss candidates and issues,'" *id.* (internal alterations omitted) (quoting *Buckley*, 424 U.S. at 21); *see also Vt. Right to Life*, 758 F.3d at 140 ("Contribution limits are more leniently reviewed because they pose only indirect constraints on speech and associational rights." (internal quotation marks and citation omitted)).

Under this "lesser but still rigorous standard of review," we may sustain "even a significant interference with protected rights of political association . . . if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms." *McCutcheon*, 572 U.S. at 197 (internal alteration, quotation marks, and citations omitted). At both steps of this analysis, the state "bears the burden of proving the constitutionality of its actions." *Id.* at 210 (citation omitted).

As to what counts as a sufficiently important state interest, the Supreme Court "has recognized only one permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance." *Cruz*, 596 U.S. at 305; *see also McCutcheon*, 572 U.S. at 192 ("Any regulation [limiting campaign contributions] must . . . target what we have called '*quid pro quo*' corruption or its appearance."). However, "government regulation may not target the general gratitude a candidate may feel toward those who support him or his allies, or the political access such support may afford." *McCutcheon*, 572 U.S. at 192. In other words, "[i]ngratiation and access . . . are not corruption." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 360 (2010); *see also Ognibene*, 671 F.3d at 204 (Livingston, *J.*, concurring in part and concurring in the judgment) ("[F]avoritism

31

and influence, unlike corruption, are unavoidable in representative politics, in which a legitimate and substantial reason for casting a ballot or making a contribution is that the candidate will respond by producing those political outcomes the supporter favors." (internal quotation marks and citations omitted)). To ascertain the line between corruption and influence, we focus on *quid pro quo* corruption, *i.e.*, the "direct exchange of an official act for money." *McCutcheon*, 572 U.S. at 192.[15]

Once a state demonstrates that a sufficient anticorruption interest motivated its contribution limit, the state must then show that those limits are "closely drawn" to avoid unnecessary burdens on political speech or associational freedoms. *See McCutcheon*, 572 U.S. at 197 (citations omitted). Closely drawn means "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, that employs not necessarily the least restrictive means but a

---

[15] Efforts to restrict campaign speech "based on other legislative aims" have largely failed. *Cruz*, 596 U.S. at 305. For example, the Supreme Court has "denied attempts to reduce the amount of money in politics," "to level electoral opportunities by equalizing candidate resources," and "to limit the general influence a contributor may have over an elected official." *Id.* *But see Ognibene*, 671 F.3d at 197–98 (Calabresi, *J.*, concurring) (questioning the rejection of a "level playing field" interest).

means narrowly tailored to achieve the desired objective." *Id.* at 218 (internal alterations, quotation marks, and citations omitted) .

## A. Contribution Limits

UJP claims that New York's campaign finance rules violate the First Amendment by permitting (1) higher individual contributions to parties than to independent bodies and (2) unlimited transfers from parties to candidates but only capped transfers from independent bodies to candidates.[16] The district court determined that these rules were supported by New York's sufficiently important goal of stanching corruption but were not closely drawn to achieving this aim. *Upstate Jobs Party*, 559 F. Supp. 3d at 131–36. We disagree.

### 1. Anticorruption State Interest

We agree with the district court that New York has sufficiently demonstrated that its interest in anticorruption motivates the distinct contribution limits for parties and independent bodies. In general, the possibility that "large direct contributions" to candidates "could be given to secure a political *quid pro*

---

[16] In its briefing, UJP does not disaggregate its challenge into these two components, instead referring to them jointly as New York's "contribution limits" or "contribution regime." Nor does it argue that the transfer limit is duplicative of the contribution limit. We therefore do not separately consider the merits of a hypothetical distinct challenge to the constitutionality of the transfer limit.

*quo*" renders limits on direct contributions permissible "to ensure against the reality or appearance of corruption." *Citizens United*, 558 U.S. at 356–57 (internal quotation marks and citation omitted). As one of the State Board's experts averred, designing contribution limits in accord with an organization's size furthers anticorruption goals; if independent bodies, consisting of only the candidate and possibly a few other individuals, could "receive contributions of the size . . . permitted for political parties," candidates would have a strong incentive to use independent bodies as a vehicle to evade contribution limits. *See* App'x 149. The effect would be most apparent in smaller elections with lower contribution limits, allowing a candidate to amass contributions well beyond the prescribed candidate limits via its independent body.

Another State Board expert provided a hypothetical illustrating these corruption fears. Imagine a candidate running for town supervisor in an election with an individual contribution limit of $1,000. *Id.* at 161. Dissatisfied with this contribution limit, the candidate forms an independent body and gathers the requisite petition signatures to appear on the ballot as the body's nominee. *Id.* If UJP has its way, this newly created independent body could collect up to $138,600 from any individual contributor—more than 138 times the individual

34

contribution limit applicable to town supervisor candidates under existing law. *Id.* This would eviscerate New York's prescribed contribution limits, thereby increasing the appearance of and the opportunities for *quid pro quo* corruption that these individual contribution limits were intended to prevent.[17]

The same concern does not apply to New York's political parties, which "have significant democratic controls" that simply "do not exist for independent bodies." App'x 153. Almost by definition, political parties in New York have a relatively lower risk of *quid pro quo* corruption, owing to their substantial measure of statewide support. In addition, political parties can be expected to run many candidates throughout the state in any given election cycle, thereby diffusing the corruptive potential or appearance of any large contribution. *See McCutcheon*, 572 U.S. at 225–26 ("[T]here is a clear, administrable line between money beyond the base limits funneled in an identifiable way to a candidate—for which the

---

[17] UJP argues that this hypothetical is implausible because the conduct described would violate New York's anticircumvention rules. We do not see how. New York law prohibits any person from making contributions in somebody else's name, N.Y. Elec. Law § 14-120(1), or from making contributions with the intent to evade applicable contribution limits, *id.* § 14-126(5), (6). But, under UJP's desired limits, individuals would be expressly permitted to contribute up to $138,600 to an independent body, and independent bodies would be free to make unlimited transfers to their candidates. Thus, contrary to UJP's claim, New York's anticircumvention rules are not implicated in the State Board's example.

candidate feels obligated—and money within the base limits given widely to a candidate's party—for which the candidate, like all other members of the party, feels grateful.").

Conversely, independent bodies are not subject to the same regulatory scheme and may be organized without any democratic input. They typically serve as the alter ego of a single candidate or small group of candidates. *See* App'x 81–82, 91–92. Thus, if the contribution limit for independent parties were raised to match that of political parties, the effective result would be increased direct contributions for independent candidates in all races—even small ones with relatively few voters. The State Board has a legitimate concern about an election in which small, closely held independent bodies running as few as one candidate—and not subject to any regulatory constraints—are able to obtain six-figure individual contributions.

As already discussed, Upstate Jobs, itself, underscores this point. It appears to have just a handful of supporters, and its single meaningful donor is also the only meaningful donor to its related IEC, which for years shared the same three-member Board of Directors. Upstate Jobs has only ever nominated three candidates, and never more than one in a given election cycle. Given Upstate

36

Jobs's small size, limited donor pool, and concentrated leadership base, there are simply not enough mechanisms within the organization to ensure that New York's valid anticorruption interests are served.

In arguing to the contrary, UJP relies on *Davis v. Federal Election Commission* for the proposition that "imposing different contribution . . . limits on candidates" competing in the same election "is antithetical to the First Amendment," 554 U.S. 724, 743–44 (2008). At issue in *Davis* was the so-called "Millionaire's Amendment" of the Bipartisan Campaign Reform Act ("BCRA"), which increased the individual contribution limits applicable to opposition candidates when another candidate expended a certain amount of personal funds. *Id.* at 729. The Supreme Court construed the Millionaire's Amendment as "impos[ing] an unprecedented penalty" on candidates' exercise of their First Amendment rights, by creating a scheme whereby a candidate's "vigorous exercise of the right to use personal funds to finance campaign speech produce[d] fundraising advantages for opponents in the competitive context of electoral politics." *Id.* at 739. "The resulting drag on First Amendment rights" was unconstitutional because it put candidates who wished to self-finance their campaigns in a bind: "abide by a limit on personal expenditures or endure the burden that is placed on that right by the

activation of a scheme of discriminatory contribution limits." *Id.* at 739-40.

Because this substantial burden was not justified by any government interest in "eliminating corruption or the perception of corruption," the Court invalidated the Millionaire's Amendment. *Id.* at 740, 744.

Here, unlike Congress in *Davis*, New York has articulated a satisfactory anticorruption interest animating its individual contribution limits to independent bodies. Although UJP argues that the State Board has produced insufficient evidence to show that the challenged contribution limits serve that interest, "[i]t is not necessary to produce evidence of actual corruption to demonstrate the sufficiently important interest in preventing the appearance of corruption." *Ognibene*, 671 F.3d at 183. This is "because the scope of *quid pro quo* corruption can never be reliably ascertained," entitling legislatures to design and enact measures that safeguard the integrity of our representative democracy. *Id.* at 187; *see id.* at 188 ("There is no reason to require the legislature to experience the very problem it fears before taking appropriate prophylactic measures.").

To be sure, "mere conjecture" is inadequate to satisfy the state's "First Amendment burden," *McCutcheon*, 572 U.S. at 210 (quoting *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 (2000)), and "the threat of corruption cannot be

38

'illusory,'" *Ognibene*, 671 F.3d at 183 (quoting *Buckley*, 424 U.S. at 27). But, for reasons we previously articulated, the State Board's argument in support of its anticorruption interest is neither "mere conjecture," nor "illusory."

At any rate, the present case contrasts sharply with the examples UJP marshals to support its demand for substantial evidence of New York's anticorruption purpose. For instance, in *McConnell v. Federal Election Commission*, the government argued that it needed to ban political contributions from minors in order to guard against "corruption by conduit"—*i.e.*, parents using "their minor children to circumvent contribution limits applicable to the parents." 540 U.S. at 231–32, *overruled on other grounds by Citizens United*, 558 U.S. 310. The Court rejected this justification because the government "offer[ed] scant evidence of this form of evasion." *Id.* at 232.

In an effort to point out similar deficiencies in the State Board's justification, UJP emphasizes that (1) the State Board has never brought an enforcement action against an independent body for evading a contribution limit, and (2) there is no evidence that an independent body has ever been implicated in a corruption scandal in New York. However, this argument ignores that "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny . . . will vary up

or down with the novelty and plausibility of the justification raised." *Shrink Mo.*, 528 U.S. at 391. Here, the State Board has provided a straightforward and well-recognized justification for New York's distinct contribution limits for political parties and independent bodies: in the absence of these limits, donors could bestow large contributions on concentrated independent bodies serving as the alter ego of a single candidate. This justification reflects "[t]he idea that large contributions" can "corrupt or . . . create the appearance of corruption," *McConnell*, 540 U.S. at 144, which the Supreme Court endorsed nearly a half-century ago in *Buckley* and has since repeated, *see McCutcheon*, 572 U.S. at 225 ("[T]he risk of corruption arises when an individual makes large contributions to the candidate or officeholder himself."); *Shrink Mo.*, 528 U.S. at 390 (discussing "the perception of corruption inherent in a regime of large individual financial contributions to candidates for public office" (internal quotation marks and citation omitted)). Thus, the State Board's justification in this case "is neither novel nor implausible," *McConnell*, 540 U.S. at 144, and the State Board has provided the relatively low quantum of evidence required under these circumstances.

In addition, UJP points to a lack of legislative findings in the record concerning the corruption risk posed by independent bodies. In context, however, the relevant legislative history supports rather than undercuts the State Board's rationale. In 1992, following a series of corruption scandals, the legislature enacted New York's first party contribution limit of $62,500, subject to inflation adjustment. 1992 N.Y. Sess. Laws ch. 79 § 25. This measure was adopted on the heels of a years-long investigation by the New York State Commission on Government Integrity, which held dozens of public hearings and conducted interviews of more than 1,000 people before recommending a bevy of governance reforms. *See* New York State Comm'n on Gov't Integrity, *Integrity and Ethical Standards in New York State Government: Final Report to the Governor*, 18 Fordham Urb. L.J. 251, 252 (1991). As relevant to the challenged contribution limits here, the Commission issued two reports attesting to the existence of a "pay-to-play" dynamic in New York's electoral system and a connection between financial contributions to *parties* and policy outcomes.[18] The absence of specific

---

[18] *See generally* N.Y. State Comm'n on Gov't Integrity, *The Midas Touch: Campaign Finance Practices of Statewide Officeholders* (1989), *available at* https://ir.lawnet.fordham.edu/feerick_integrity_commission_reports/18/; N.Y. State Comm'n on Gov't Integrity, *The Albany Money Machine: Campaign Financing for New York State Legislative Races* (1988), *available at* https://

findings related to scandals involving independent bodies is unsurprising, as the Commissioner's focus was on corruption stemming from New York's under-regulated party system.

This history reveals that UJP is seeking evidence of corruption in independent bodies that, for good reasons, does not exist. Because the status quo ante was *unlimited* contributions to *parties*, the legislature sought ways to reform New York's system for regulating political parties in particular. Thus, the lack of evidence of the nature UJP seeks does not cast doubt on the anticorruption aims of New York's contribution limitations.

In sum, the State Board has demonstrated that asymmetry in New York's contribution limitations is supported by a sufficiently important state interest in combatting actual and apparent *quid pro quo* corruption.

### 2. *Closely Drawn*

The district court struck down New York's contribution limits after finding that they were not closely drawn to their anticorruption purpose, in large part because the State Board did not substantively rebut UJP's proffered narrower

---

ir.lawnet.fordham.edu/feerick_integrity_commission_reports/21/.

42

alternatives to the disparate contribution limits. *See Upstate Jobs Party*, 559 F. Supp. 3d at 133–36.

Contrary to the district court's analysis, the closely drawn test is not a "least restrictive means" test. Properly construed, the closely drawn test allows a state to enact restrictions that are "not necessarily perfect, but reasonable," commensurate with the interest served, and "not necessarily the least restrictive means but a means narrowly tailored to achieve the desired objective." *McCutcheon*, 572 U.S. at 218 (internal alteration and citations omitted).

The challenged contribution limits satisfy this standard. "On only one occasion has the Supreme Court held that a contribution limit was not closely drawn to the government's interests." *Green Party of Conn. v. Garfield* ("*Green Party I*"), 616 F.3d 189, 201 (2d Cir. 2010). That was in *Randall v. Sorrell*, where the Supreme Court evaluated several factors before holding unconstitutional a Vermont law limiting individual contributions per election to $400 to a candidate for governor, lieutenant governor, or other statewide office, $300 to a candidate for state senator, and $200 to a candidate for state representative. 548 U.S. at 236, 238; *see also Thompson v. Hebdon*, 589 U.S. 1, 5–6 (2019) (per curiam) (confirming that the *Randall* factors should guide the "closely drawn" analysis for contribution

43

limits). Vermont imposed these same contribution restrictions on political parties, "defined broadly to include 'any subsidiary, branch or local unit' of a party, as well as any 'national or regional party affiliates' of a party." *Randall*, 548 U.S. at 238 (citation omitted). In striking down Vermont's contribution limits as violative of the First Amendment, Justice Breyer's plurality opinion observed that "contribution limits that are too low can . . . harm the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders, thereby reducing democratic accountability." *Id.* at 248–49. In this way, too-low limits can "prove an obstacle to the very electoral fairness [they] seek[] to promote." *Id.* at 249.

The Court therefore evaluated whether Vermont's contribution limits "prevent[ed] candidates from 'amassing the resources necessary for effective campaign advocacy; . . . [or] magnif[ied] the advantages of incumbency to the point where they put challengers to a significant disadvantage; in a word, whether they [were] too low and too strict to survive First Amendment scrutiny." *Id.* at 248 (internal alteration omitted) (quoting *Buckley*, 424 U.S. at 21). In the Court's view, Vermont's law exhibited several "danger signs" that warranted close review, *id.* at 249, namely that the state's contribution limits were "substantially

44

lower than both the limits [the Court had] previously upheld and comparable limits in other States," *id.* at 253. In addition to these "danger signs," *id.* at 249, five factors influenced the Court's conclusion that Vermont's contribution limitations were not closely drawn: (1) they stood to "significantly restrict the amount of funding available for challengers to run competitive campaigns," *id.* at 253; (2) the law "insist[ed] that political parties abide by *exactly* the same low contribution limits that apply to other contributors," which "threaten[ed] harm to a particularly important right, the right to associate in a political party," *id.* at 256; (3) the law exempted volunteer services to a campaign but did not exclude "the expenses those volunteers incur . . . in the course of campaign activities," thereby "aggravat[ing]" the law's constitutional infirmities, *id.* at 259; (4) the contribution limits were not adjusted for inflation, *id.* at 261; and finally (5) the state failed to offer "any special justification that might warrant a contribution limit so low or so restrictive," *id.*

The first, second, and fourth *Randall* factors are particularly salient to this case, and each favors upholding New York's contribution limits. As to the first factor, unlike in *Randall*, New York's $9,000 individual contribution limit to statewide candidates comfortably exceeds limits the Supreme Court has

45

previously upheld.  *See Buckley*, 424 U.S. at 29 (upholding $1,000 per election individual contribution limit, which is approximately $5,500 in today's dollars); *see also Shrink Mo.*, 528 U.S. at 382–83, 395–96 (upholding $1,075 per election limit for candidates for statewide office in Missouri).   Even after New York's recent decision to lower the individual contribution limits, they remain higher than the national average and median.[19]   Furthermore, federal law, like New York law, allows individuals to contribute more to a party ($10,000 to a state, district, or local party; $41,300 to a national party) than to a candidate ($3,300) or other political committee ($5,000).   *See* 52 U.S.C. § 30116(a)(1); 11 C.F.R. § 110.1(b)(1), (c)(1), (d); 88 Fed. Reg. 7088, 7089-90 (Feb. 2, 2023).   Nor is New York an outlier among states in authorizing higher contribution limits for parties than for other types of donors, as at least twenty-eight other states (as of the 2021-2022 election cycle) generally permit parties to give more money directly to candidates than individuals, unions,

---

[19]  As of February 1, 2023, the national average and median contribution limits for a governor's race were $6,645 and $4,240, respectively (compared to $9,000 in New York). The national average and median contribution limits for a state senate race were $3,062 and $2,250, respectively (compared to $5,000 in New York).   Finally, the national average and median contribution limits for a state house seat were $2,708 and $1,900, respectively (compared to $3,000 in New York).   *See* Nat'l Conf. of State Legislatures, Campaign Contribution Limits: Overview, https://www.ncsl.org/elections-and-campaigns/campaign-contribution-limits-overview.

corporations, or PACs can give.[20]     Indeed, ten states permit unlimited contributions to candidates from state parties but not from non-party organizations in most general election circumstances.[21]

As to the second factor, the *Randall* Court's concern that Vermont law jeopardized "the particularly important right . . . to associate in a political party" by requiring "political parties [to] abide by *exactly* the same low contribution limits that apply to other contributors," is not present here, where the basis of UJP's challenge is the *higher* contribution limit applicable to parties.   *Randall*, 548 U.S. at 256.   The Supreme Court has affirmed the centrality of political parties as a locus of First Amendment associational activity on several occasions.   *See, e.g.*, *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574–76 (2000) (describing constitutional importance of associating in political parties); *Timmons v. Twin Cities Area New*

---

[20] These states are: Alaska, Arizona, California, Colorado, Connecticut, Delaware, Florida, Idaho, Illinois, Kansas, Kentucky, Louisiana, Massachusetts, Michigan, Minnesota, Montana, New Jersey, North Carolina, Ohio, Oklahoma, Rhode Island, South Carolina, South Dakota, Tennessee, Vermont, Washington, Wisconsin, and Wyoming. *See* National Conference of State Legislatures, State Limits on Contributions to Candidates, 2021-2022, https://documents.ncsl.org/wwwncsl/Elections/Contribution-Limits/2021-2022.pdf [hereinafter, "NCSL, State Limits on Contributions to Candidates"].

[21] These states are: California, Illinois, Kansas, Kentucky, Louisiana, New Jersey, North Carolina, Vermont, Wisconsin, and Wyoming.   *See* NCSL, State Limits on Contributions to Candidates.

*Party*, 520 U.S. 351, 357 (1997) ("The First Amendment protects the right of citizens to associate and to form political parties for the advancement of common political goals and ideas."); *Norman v. Reed*, 502 U.S. 279, 288 (1992) ("For more than two decades, this Court has recognized the constitutional right of citizens to create and develop new political parties."). Congress also appears to appreciate the importance of political parties, given that FECA allows "individuals to contribute more money . . . to a party than to a candidate . . . or to other political committees." *Colo. Republican Fed. Campaign Comm. v. Fed. Election Comm'n*, 518 U.S. 604, 616 (1996); *see* 52 U.S.C. § 30116(a)(1). In announcing the judgment of the Court, Justice Breyer highlighted how FECA's differential treatment of parties as compared to non-parties "demonstrate[d] Congress' general desire to enhance what was seen as an important and legitimate role for political parties in American elections," *Colo. Republican Fed. Campaign Comm.*, 518 U.S. at 618. Such reasoning undermines UJP's challenge to New York's analogous provision.

New York's campaign finance regime also does not inhibit Upstate Jobs or other independent bodies "from amassing the resources necessary for effective advocacy." *Randall*, 548 U.S. at 247 (citation omitted). The higher-than-average $9,000 contribution limit applicable to Upstate Jobs's candidates for statewide

48

office is not "so radical in effect as to render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render contributions pointless," *Shrink Mo.*, 528 U.S. at 397. This sort of extreme restriction aside, legislatures are best situated to set appropriate contribution limits. *See Beaumont*, 539 U.S. at 155 ("[D]eference to legislative choice is warranted particularly when Congress regulates campaign contributions, carrying as they do a plain threat to political integrity and a plain warrant to counter the appearance and reality of corruption . . . .").

Finally, as to the fourth *Randall* factor, New York's contribution limit, unlike Vermont's, is subject to adjustment for inflation. *See* N.Y. Elec. Law § 14-114(10)(b).

The district court did not undertake the *Randall* analysis in striking down New York's contribution limits. Instead, it faulted the state for failing to explain why alternative laws such as disclosure regulations, anti-proliferation rules, or required segregation of funds could not more narrowly address its anticorruption concerns. *See Upstate Jobs Party*, 559 F. Supp. 3d at 135–36. But, even if these alternatives might also serve anticorruption interests, they fail to account for the reality that independent bodies—as exemplified by Upstate Jobs itself—are

49

typically closely held entities that function as the alter ego of a single candidate. Thus, due to their structure, independent bodies often serve as the sort of "conduits for contributions to candidates" that "pose a perceived threat of actual or potential corruption." *Cal. Med. Ass'n*, 453 U.S. at 203 (Blackmun, *J.*, concurring in part and concurring in the judgment); *see Vt. Right to Life*, 758 F.3d at 145 ("The Supreme Court has upheld limitations on contributions to entities whose relationships with candidates are sufficiently close to justify concerns about corruption or the appearance thereof." (internal quotation marks omitted)).

In sum, we conclude that New York has met its burden to establish that the lower contribution limits applicable to independent bodies are closely drawn to an important interest in preventing actual and apparent *quid pro quo* corruption. In reaching this conclusion, we are not required to "exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977)). Exercising this common sense, we conclude that, without these limits, real or perceived corruption could result from a candidate's knowledge that one donor has provided the lion's share of his campaign cash or a large donor's knowledge that his money will go to a single candidate.

### 3. *Babinec's First Amendment Claim*

The district court separately determined that the challenged contribution limits, which prevent Babinec and similarly situated individuals from donating the same amount to an independent body as they could to a political party, violate Babinec's First Amendment rights. *See Upstate Jobs Party*, 559 F. Supp. 3d at 136.[22] But, as just discussed in the context of UJP's claims, New York's contribution limits are closely drawn to advancing the state's anticorruption objectives, thereby defeating Babinec's First Amendment challenge. Two additional points demonstrate the flaws in Babinec's assertion of his personal First Amendment rights in this context.

First, Babinec argues that New York's contribution limits restrict speech based on the identity of the speaker. In support of this argument, Babinec cites the rule enunciated in *Citizens United* that "the First Amendment stands against attempts to disfavor certain subjects or viewpoints," prohibiting "restrictions distinguishing among different speakers, allowing speech by some but not others." 558 U.S. at 340. However, the restrictions of which Babinec complains

---

[22] The State Board is correct that Babinec asserted only a First Amendment claim in the complaint and has not asserted a Fourteenth Amendment claim.

are not speaker-based. New York's contribution limits distinguish between the recipients of the contributions, not the contributors; Babinec, for example, could donate the maximum amount to a political party, if he saw fit, and is not limited to contributing to independent bodies. As such, the contribution limits are not analogous, from a First Amendment perspective, to the total ban on independent expenditures from a corporation's general treasury that was at issue in *Citizens United*. *See id.* at 365 ("[T]he Government may not suppress political speech on the basis of the speaker's corporate identity."). To the contrary, the Supreme Court has approved differential contribution limits based on the identity of the recipients. *See Colo. Republican Fed. Campaign Comm.*, 518 U.S. at 616 (recognizing that different contribution limits apply under federal law based on speaker's decision to contribute to a party, candidate, or political committee). Ignoring this distinction, Babinec analogizes his position to that of the contributor-plaintiffs in *Riddle*, arguing that New York's contribution limits unconstitutionally "create[] a class of favored contributors who contribute to Parties and disfavored contributors who contribute to Independent Bodies." Pls.' Final Opening & Resp. Br. at 56. Unlike in *Riddle*, where the relevant statute arbitrarily distinguished between contributors based on the time when their preferred candidate entered the race,

742 F.3d at 924, New York law "sensibl[y]" distinguishes between political parties and independent bodies based on their base of support. *Jankowski-Burczyk*, 291 F.3d at 176. Moreover, the *Riddle* defendants did not argue that the "problem" created by the state—primary elections—was meant to fight *quid pro quo* corruption. Here, by contrast, requirements forcing parties to implement democratic controls reduce the possibility of individuals controlling parties and, therefore, the attendant appearance of corruption.

Second, while the challenged restrictions limit the amount Babinec may give to his preferred political organization, the burden on his right to engage in political expression is not so substantial as to violate the First Amendment. Babinec remains entitled to spend unlimited sums through an IEC—a right he has exercised to the tune of $265,898 in contributions to the Upstate Jobs Committee. *See* App'x 71–72. We made a similar point in *Corren v. Condos*, 898 F.3d 209 (2d Cir. 2018), a case assessing a Vermont law requiring candidates who accepted public funds to forgo most private contributions, *see id.* at 213-25. In that case, we upheld the restriction on private funds when a candidate voluntarily opted into the state's public financing scheme, in part because "supporters retained a wide range of ways to express their support given . . . [their] ability to make unlimited

independent expenditures." *Id.* at 223 (internal quotation marks and citation omitted).

For these reasons, as well as those outlined with respect to the other plaintiffs' challenge, New York's contribution limits do not violate Babinec's First Amendment rights.

## B. Housekeeping Accounts

UJP also challenges the housekeeping account exception to New York's contribution limits as violative of the First and Fourteenth Amendments. Under this exception, political parties, but not independent bodies, can maintain unlimited segregated accounts, so long as expenditures from these accounts are made "to maintain a permanent headquarters and staff and carry on ordinary activities which are not for the express purpose of promoting the candidacy of specific candidates." N.Y. Elec. Law § 14-124(3). The district court's decision to uphold this rule is the subject of UJP's cross-appeal.

The district court upheld the housekeeping account exception against UJP's First and Fourteenth Amendment challenges, determining that it was closely drawn and the least restrictive means necessary to serving New York's anticorruption interests. *Upstate Jobs*, 559 F. Supp. 3d at 139–40. For reasons

already discussed, *see supra* at [22], parties and independent bodies are not similarly situated, defeating UJP's Fourteenth Amendment challenge to the housekeeping account exception. As to the First Amendment challenge, we hold that the district court correctly upheld the housekeeping account rule as sufficiently tailored to advancing the government's anticorruption interest. Like New York's differential contribution limits, its housekeeping account exception recognizes meaningful organizational differences between political parties and independent bodies.

### 1. *Speaker-Based Distinction*

To start, UJP argues that New York's housekeeping account rule draws an unconstitutional speaker-based distinction, "allowing speech by some but not others," *Citizens United*, 558 U.S. at 340. The First Amendment prohibits such distinctions, as"[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Id.*

However, the challenged rule is not an attempt to "control content." Whether an entity may create a housekeeping account hinges on whether it has garnered enough statewide support to become a party, not what it wants to "say" by spending unlimited sums on housekeeping. Party status in New York is fluid,

not permanent; any independent body, with any platform or viewpoint, can become a party and enjoy the housekeeping account exception if it garners enough public support. *Cf. Green Party II*, 616 F.3d at 231 (holding that Connecticut could "distinguish between candidates who can, and who cannot, make a preliminary showing of public support" in the provision of public campaign funds); *Buckley*, 424 U.S. at 97–98 (noting the "obvious differences . . . between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other" in explaining that "the Constitution does not require Congress to treat all declared candidates the same for public financing purposes").

Upstate Jobs attempts to distinguish these cases because they involved apportioning public funds to candidates. Even recognizing that the public campaign finance context might implicate unique interests, these considerations do not undercut the permissibility of popularity-based distinctions here. In this context, New York's distinction between parties and independent bodies is based on a transitory status that any independent body, of whatever political persuasion, can overcome via success at the ballot box. UJP's speaker-based challenge to the housekeeping accounts exception therefore fails.

56

## 2. *Anticorruption State Interest*

To justify the application of its housekeeping accounts exception to only political parties, the State Board provides the same anticorruption justification as for its contribution limits. Its concern lies primarily with permitting unlimited contributions to political organizations that are often small and tightly intertwined with a single candidate or a small handful of candidates.

The State Board offers an illustrative hypothetical. Suppose a wealthy donor makes a significant contribution to the housekeeping account of an independent body fielding just one candidate in a single election. New York Election Law § 14-124(3)'s "express purpose" restriction would prevent the independent body, in theory, from spending that money directly on that candidate's campaign; but in practice, because money is fungible, every dollar contributed to a housekeeping account would free up another dollar for direct candidate support. Indeed, UJP's complaint acknowledges as much. *See* App'x 18 ("Without this [housekeeping] account, the UJP is required to pay for its headquarters and pay UJP staff salaries from donor dollars that are limited to the maximum amount for the candidates the UJP is fielding. This siphons money away from the UJP that it needs to disseminate its message." (citation omitted)).

While this threat might appear mitigated, at least in part, by general contribution and transfer limits, there are, nevertheless, myriad ways that housekeeping funds could be spent to benefit a single candidate in keeping with § 14-124(3)'s "express purpose" restriction, such as funding targeted get-out-the-vote efforts or hiring the candidate's inner circle as staff.

Even if parties' housekeeping accounts present similar risks, the critical distinction is parties' larger size and attending democratic controls. *See supra* at [33] Thus, because of the likelihood of an independent body being merely the alter ego of a candidate, there is a greater risk of contributions earmarked for such a body's housekeeping account functionally being direct contributions to the candidate, creating a heightened opportunity for *quid pro quo* corruption. *Cf. McCutcheon*, 572 U.S. at 210 ("[T]here is not the same risk of *quid pro quo* corruption or its appearance when money flows through independent actors to a candidate, as when a donor contributes to a candidate directly."). In other words, to the extent independent bodies function as alter egos of their candidates, there may be no practical distinction between donating to an independent body's housekeeping account and donating directly to a candidate. Like the district court, we recognize this as a valid concern supporting the different contribution limits.

As with the contribution limits, Upstate Jobs argues that the legislative history of the housekeeping account rule contains insufficient evidence of corruption in independent bodies to support the state's purported rationale. We disagree. The history reveals a basis for the legislature's concern that corruption could flow from unchecked donations to party housekeeping accounts in ways equally applicable to independent bodies. In 1988, New York amended its election law to require parties to disclose all monies received into, or expended from, housekeeping accounts. App'x 164–65; *see* N.Y. Elec. Law § 14-124. Previously, New York had exempted party housekeeping accounts from financial disclosure requirements, which led to "[r]eported abuses of these accounts," including "concealing contributions exceeding the legal ceiling for giving to an organization's campaign account, or juggling funds to promote a candidate, which is prohibited." *Id.* at 164. These accounts "ha[d] been used as a shield or a novel defense by public officials who [had] been charged with bribery." *Id.* The addition of disclosure requirements for these accounts was designed to "close this loophole that create[d] a breeding ground for corruption," *id.*, "protect[] against the corrupt use of the resources of political organizations," *id.* at 165, and stem "the corruption . . . eat[ing] away at the credibility of our political system," *id.* at 181–

82.[23]   Thus, as this history demonstrates, the legislature imposed disclosure requirements for housekeeping accounts *because of corruption concerns.*

In this regard, the district court aptly described the state's corruption concerns surrounding housekeeping accounts, observing that "candidates from these Independent Bodies would be able to easily identify the source of the donation, which could lead to a candidate feeling obligated to take certain positions and contribute to the appearance of *quid pro quo* corruption." *Upstate Jobs Party*, 559 F. Supp. 3d at 139. We conclude that this is a sufficiently important anticorruption interest, reinforced by the legislative history of the most recent amendment to the housekeeping account rule.

### 3. Closely Drawn

Next, the district court determined that New York's housekeeping account exception was closely drawn to its anticorruption interest. In doing so, the district court recognized the sense in preventing independent bodies from having these unlimited accounts in which "ordinary contribution limits do not apply,"

---

[23] In line with our analysis as to the efficacy of § 14-124(3)'s "express purpose" restriction, a letter to Governor Mario Cuomo from John D. Feerick, Chairman of the New York Commission on Government Integrity, opining on the legislation, also explained that "[d]ollars, of course, are fungible and every dollar deposited into a 'housekeeping' account frees another dollar for use in a campaign." App'x 172.

thus raising "a significant danger of the appearance of *quid pro quo* corruption in connection with them." *Id.* We agree.

First, affording housekeeping accounts only to parties does not represent the type of redundant "prophylaxis-upon-prophylaxis" regulation of independent bodies upon which the Supreme Court has looked skeptically. *Cruz*, 596 U.S. at 306. As explained above, because money is fungible, even when earmarked as housekeeping contributions, it can create corruption risks in alter ego independent bodies. Thus, a housekeeping exception for such bodies would substantially undermine the general contribution limit, which we have already found is closely drawn to the state's interest in preventing actual and apparent *quid pro quo* corruption. As such, excluding independent bodies from creating unlimited housekeeping accounts is essential to enforcing that contribution limit—the primary prophylaxis against corruption.

Second, Upstate Jobs' own activities illustrate how the lack of a housekeeping account exception for small independent bodies does not cause "unnecessary abridgement of First Amendment rights." *McCutcheon*, 572 U.S. at 199 (internal quotation marks omitted). While Upstate Jobs has held several meetings and focus groups and spent funds on digital media and mailers, the

61

record shows that, given its small size, it has never needed additional housekeeping funds. In 2018, the only year for which the record contains complete financial data—and also the most recent year in which Upstate Jobs nominated a candidate—Upstate Jobs took in $88,000 but spent only $48,891, leaving it with net assets of $39,109. App'x 56, 220. Babinec acknowledged a similar "expense pattern" in 2019. Babinec Depo. at 82–83, Ex. A to Pl.'s Statement of Material Facts, Dist. Ct. Dkt. 56-3. A 2018 tax form also stated that each of Upstate Jobs' three directors only worked an average of one hour per week. App'x 220. The fact that Upstate Jobs did not spend all of its funds does not necessarily imply that a law limiting its ability to obtain more funding does not burden its First Amendment rights. *See generally Cruz*, 596 U.S. at 318 (Kagan, *J.*, dissenting) ("[E]very contribution regulation has some kind of indirect effect on electoral speech[.]"). Nevertheless, when considered together with the lack of any record evidence of Upstate Jobs's plan to expand, or the expected costs of such expansion, the noted financial surplus substantially undermines Babinec's bare assertion that UJP would have spent more housekeeping funds but for the challenged laws. *See* App'x 105–06.

That does not end the inquiry, however, because even though the state need not use the least restrictive means to serve its anticorruption interest, the question of whether a regulation "unnecessar[ily] abridge[s]" First Amendment rights requires consideration of less restrictive alternatives to ensure that it is "reasonable" and "in proportion to the interest served." *McCutcheon*, 572 U.S. at 218 (internal quotation marks omitted). Arguing that less restrictive alternatives were available here, UJP relies on *Green Party I*, in which we struck down Connecticut's complete ban on contributions by state contractors, lobbyists, and their families on the basis that a total contribution ban "utterly eliminates an individual's right to express his or her support for a candidate by contributing money to the candidate's cause." 616 F.3d at 206. We reasoned in that case that "if the state's interests . . . can be achieved by means of a *limit* on lobbyist contributions, rather than a ban, the ban should be struck down for failing 'to avoid unnecessary abridgement of associational freedoms.'" *Id.* (quoting *Buckley*, 424 U.S. at 25).

This case, in fact, exposes the flaw in UJP's attempt to frame the challenged provision as a ban. The fact that the housekeeping exception lifts the cap on contributions to parties has no effect on independent bodies' ability to receive

63

donations up to the cap applicable to them. Contributors may give up to $9,000 to independent bodies supporting a candidate for statewide office—which money can be used for various purposes, including housekeeping. As already explained, adopting UJP's suggestion that New York establish a separate, higher limit for housekeeping account contributions to independent bodies would be tantamount to raising the general contribution limits. Determining appropriate contribution limits, however, is an issue best left for state legislatures. *See Randall*, 548 U.S. at 248 ("[W]e have no scalpel to probe each possible contribution level . . . the legislature is better equipped to make such empirical judgments . . . ." (internal quotation marks and citation omitted)).

The other three alternatives UJP proposes to lessen the burden on First Amendment rights while still serving the state's anticorruption interest fare no better. The first—that New York could simply regulate independent bodies as parties—is plainly flawed. Requiring all independent bodies, *inter alia*, to establish committees in every county and election district in the state, to utilize prescribed procedures for filling party leadership positions, and to notify the State Board of changes in committee composition, among other things, would be far more burdensome than the challenged restrictions. Indeed, this proposal could

make it impossible for grassroots political organizations to operate, effectively regulating independent bodies out of existence.

Second, UJP suggests that New York could require independent bodies to disclose all funds that go in and out of their housekeeping accounts. This proposal runs into the same problem as it did in the context of UJP's challenge to the contribution limits. Although disclosure may serve some deterrent effect, it does not cure the corruption risk associated with permitting unlimited individual contributions to exceedingly small political organizations.

UJP's third proposal to establish anti-proliferation statutes, which would "prohibit[] individuals from establishing Independent Bodies when those individuals are connected to either Parties or other Independent Bodies," *Upstate Jobs Party*, 559 F. Supp. 3d. at 113, is likewise insufficient to demonstrate that the housekeeping rule is not closely drawn. Anti-proliferation statutes might prevent corruption among independent bodies from metastasizing. But they would not address the source of the corruption risk inherent in allowing donors to funnel unlimited sums to tightly controlled independent bodies.

In sum, because New York's housekeeping account rule is closely drawn to serve the state's interest in preventing *quid pro quo* corruption or the appearance thereof, it survives First Amendment scrutiny.

## CONCLUSION

For the foregoing reasons, we vacate the district court's judgment in part and affirm in part. We **VACATE** the part of the district court's judgment that granted summary judgment to UJP on its First and Fourteenth Amendment claims relating to New York's contribution limits and **REMAND** to the district court with the instruction that summary judgment be entered in favor of the State Board as to these claims. We **AFFIRM** as to the part of the district court's judgment that granted summary judgment to the State Board on First and Fourteenth Amendment claims concerning New York's housekeeping account rule.